David C. Parisi (SB #162248)
dcparisi@parisihavens.com
Suzanne Havens Beckman (SB #188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
212 Marine Street, Ste. 100
Santa Monica, CA 90405
Tel: (818) 990-1299

*Attorneys for Plaintiff*
[Additional counsel appear on signature page]

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL KATZ, individually and on behalf of a class of similarly situated individuals,<br><br>    *Plaintiff*,<br><br>    v.<br><br>AMERICAN HONDA MOTOR CO., INC., a California corporation, and J.D. POWER AND ASSOCIATES, a Delaware corporation,<br><br>    *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>Case No. 2:15-cv-04410-CBM-RAO<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: March 14, 2017<br>Hearing Time: 10:00 AM<br>Location: Courtroom 8B<br><br>Hon. Consuelo B. Marshall |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................1

II.   FACTUAL BACKGROUND.................................................................3

    A.    Defendants Designed And Implemented A Massive Telemarketing Program. .......................................................................................3

    B.    Defendants Engaged A Single Calling Vendor To Place All The Automated Telemarketing Calls At Issue. ...........................................5

    C.    Facts Specific To Plaintiff...............................................................6

III.  STATUTORY AND REGULATORY BACKGROUND ...........................7

    A.    Defendants' Telemarketing Calls Are Unlawful Under The Federal Telephone Consumer Protection Act. ..................................................7

    B.    FCC Regulations Promulgated Pursuant To The TCPA Require Defendants To Have Obtained The Class Members' Express Written Consent Prior To Sending Them Telemarketing Calls. ........................9

IV.   ARGUMENT.....................................................................................12

    A.    Plaintiff's Proposed Class Definition.................................................12

    B.    The Proposed Class Is Ascertainable Based On Objective Criteria, Because Defendants' Call Records Identify All Class Members Who Received Unlawful Telemarketing Calls On Their Cellphones..........13

    C.    The Proposed Class Meets The Four Requirements Of Rule 23(a)....14

        i.    Numerosity.................................................................................14

        ii.   Commonality..............................................................................16

        iii.  Typicality. .................................................................................20

        iv.   Adequacy. .................................................................................21

    D.    Plaintiff's Proposed Class Is Certifiable Under Rule 23(b)...............23

        i.    Common questions of law or fact predominate here due to the uniformity of Defendants' telemarketing campaign.................23

        ii.   A class action is the most efficient way of resolving the putative class members' claims and is superior to a multitude of individual lawsuits. ..................................................................27

V.    CONCLUSION..................................................................................28

# **TABLE OF AUTHORITIES**

Supreme Court Cases

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   133 S. Ct. 1184 (2013)........................................................26

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011) .........................................................24

*Gen. Tel Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) .........................................................29

*Mims v. Arrow Fin. Servs., LLC*,
   132 S. Ct. 740 (2012).......................................................7, 8

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .......................................................2, 17

Cases

*Abdeljalil v. General Elec. Capital Corp.*,
   306 F.R.D. 303 (S.D. Cal. 2015) ........................................15

*Agne v. Papa John's Int'l, Inc.*,
   286 F.R.D. 559 (W.D. Wash. 2012)...................................21

*Akaosugi v. Benihana Nat. Corp.*,
   282 F.R.D. 241 (N.D. Cal. 2012) .......................................13

*Bateman v. Am. Multi-Cinema, Inc.*,
   623 F.3d 708 (9th Cir. 2010) .............................................13

*Bee, Denning, Inc. v. Capital Alliance Group*,
   310 F.R.D. 614 (S.D. Cal. 2015) ................................. 15, 28

*Bennett v. Boyd Biloxi, LLC*,
   No. 14-0330-WS-M, 2015 WL 2131231 (S.D. Ala. May 6, 2015) ............. 10, 11

*Birchmeier v. Caribbean Cruise Line, Inc.*,
   302 F.R.D. 240 (N.D. Ill. 2014) ................................. 25, 26

Plaintiff's Mem. in Supp. of
Mot. for Class Certification
    ii    Case No. 15-CV-04410-CBM-RAO

*Booth v. Appstack, Inc.*,
    No. C13-1533JLR, 2015 WL 1466247 (W.D. Wash. March 30, 2015) ....... 21, 22

*Briseno v. ConAgra Foods, Inc.*,
    -- F.3d --, 2017 WL 24618 (9th Cir. 2017) ..........................................................14

*Brown v. Hain Celestial Group, Inc.*,
    No. 11-cv-03082, 2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) ......................13

*Charkchyan v. EZ Capital, Inc.*,
    No. 2:14-cv-03564-ODW (ASx), 2015 WL 3660315 (C.D. Cal. June 11, 2015) .9

*Chesbro v. Best Buy Stores, L.P.*,
    705 F.3d 913 (9th Cir. 2012) .................................................... 10, 11, 19

*Dukes v. Wal-Mart Stores, Inc.*,
    No. 01-cv-02252, 2012 WL 4329009 (N.D. Cal. Sept. 21, 2012) ......................13

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ...............................................................13

*Golan v. Veritas Entertainment, LLC*,
    788 F.3d 814 (8th Cir. 2015) .................................................... 10, 11

*Grant v. Capital Mgmt. Servs., L.P.*,
    449 F. App'x 598 (9th Cir. 2011)............................................. 2, 8, 20

*Green v. Serv. Master On Location Servs. Corp.*,
    No. 07 C 4705, 2009 WL 1810769 (N.D. Ill. June 22, 2009)............................27

*Greko v. Diesel U.S.A., Inc.*,
    277 F.R.D. 419 (N.D. Cal. 2011) .......................................................17

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ........................................ 17, 21, 28, 29

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir.1992) ..............................................................21

*Heffelfinger v. Elec. Data Sys. Corp.*,
    No. 07-cv-00101, 2008 WL 8128621 (C.D. Cal. Jan. 7, 2008) ..........................13

*Hinman v. M & M Rental Ctr.*,
  545 F. Supp. 2d 802 (N.D. Ill. 2008)....................................................................27

*In re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014)..........................................................................14

*In re Ferrero Litig.*,
  278 F.R.D. 552 (S.D. Cal. 2011) ..........................................................................28

*In re Live Concert Antitrust Litig.*,
  247 F.R.D. 98 (C.D. Cal. 2007)............................................................................16

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
  268 F.R.D. 652 (S.D. Cal. 2010) .................................................................... 14, 15

*In re Rubber Chem. Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005) ..........................................................................15

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) ..........................................................................13

*Joffe v. Acacia Mortg. Corp.*,
  121 P.3d 831 (Ariz. Ct. App. 2005) ........................................................................8

*Juarez v. Citibank, N.A.*,
  No. 16-cv-01984, 2016 WL 4547914 (N.D. Cal. Sept. 1, 2016) ............................1

*Kavu, Inc. v. Omnipak Corp.*,
  246 F.R.D. 642 (W.D. Wash. 2007)......................................................................27

*Knutson v. Schwan's Home Serv., Inc.*,
  No. 3:12-cv-0964-GPC-DHB, 2013 WL 4774763 (S.D. Cal. Sept. 5, 2013)......29

*Kristensen v. Credit Payment Servs.*,
  12 F. Supp. 3d 1292 (D. Nev. 2014) ............................................................. passim

*Lee v. Global Tel*Link Corp.*,
  No 2:15-cv-02495-ODW-PLA, 2016 WL 6237896 (C.D. Cal. Feb. 5, 2016) ......9

*Lerwill v. Inflight Motion Pictures, Inc.*,
  582 F.2d 507 (9th Cir. 1978)................................................................................23

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
  244 F.3d 1152 (9th Cir. 2001) .................................................................28

*Mazza v. Am. Honda Motor Co., Inc.*,
  666 F.3d 581 (9th Cir. 2012) ...................................................................24

*Meyer v. Bebe Stores, Inc.*,
  No. 14-cv-00267-YGR, 2015 WL 431148 (N.D. Cal. Feb. 2, 2015) .................11

*Meyer v. Portfolio Recovery Assocs., LLC*,
  707 F.3d 1036 (9th Cir. 2012) ........................................... 1, 17, 18, 20

*Meyer v. Portfolio Recovery Assocs., LLC*,
  No. 11cv1008 AJB (RBB), 2011 WL 11712610 (S.D. Cal. Sept 14, 2011)........22

*O'Connor v. Boeing N. Am., Inc.*,
  184 F.R.D. 311 (C.D. Cal. 1998)...............................................................14

*Ott v. Mortg. Investors Corp. of Ohio, Inc.*,
  65 F. Supp. 3d 1046 (D. Or. 2014) ...................................................... 20, 27

*Petersen v. Costco Wholesale Co., Inc.*,
  312 F.R.D. 565 (C.D. Cal. 2016)...............................................................14

*Pryor v. Aerotek Scientific, LLC*,
  278 F.R.D. 516 (C.D. Cal. 2011)...............................................................15

*Roy v. County of Los Angeles*,
  Nos. cv 12-09012, cv 13-04416, 2016 WL 5219468 (C.D. Cal. Sept 9, 2016)...16

*Saulsberry v. Meridian Fin. Servs., Inc.*,
  No. CV 14-6256, 2016 WL 3456939 (C.D. Cal. April 14, 2016)..... 15, 20, 26, 27

*Silbaugh v. Viking Magazine Servs.*,
  278 F.R.D. 389 (N.D. Ohio 2012)....................................................... 25, 26, 27

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ....................................................................23

*Steinfeld v. Discover Fin. Servs.*,
  No. C 12-01118 JSW, 2014 WL 1309352 (N.D. Cal. March 13, 2014).............16

*Stern v. DoCircle, Inc.*,
    No. SACV 12-2005 AG (JPRx), 2014 WL 486262 (C.D. Cal. Jan. 29, 2014)....22

*Van Patten v. Vertical Fitness Group*,
    No. 12cv1614-LAB (MDD) (S.D. Cal. Nov. 8, 2013)................................. 26, 28

*Vandervort v. Balboa Capital Corp.*,
    287 F.R.D. 554 (C.D. Cal. 2012)..........................................................16

*Vasco v. Power Home Remodeling Group LLC*,
    No. 15-4623, 2016 WL 5930876 (E.D. Penn. Oct. 12, 2016)............................25

*Wang v. Chinese Daily News, Inc.*,
    737 F.3d 538 (9th Cir. 2013) ................................................................17

*Wolin v. Jaguar Land Rover N. Am., LLC*,
    617 F.3d 1168 (9th Cir. 2010) ..............................................................24

*Wyatt v. Creditcare, Inc.*,
    04-03681-JF, 2005 WL 2780684 (N.D. Cal. Oct. 25, 2005) ..............................23

<u>Statutes</u>

Telephone Consumer Protection Act,
    47 U.S.C. § 227 ......................................................................... 1, 9, 18

<u>Regulations</u>

47 C.F.R. § 64.1200(a)................................................................................2

47 C.F.R. § 64.1200(f) .................................................................... passim

<u>Administrative Materials</u>

2015 FCC Order:
*Declaratory Ruling & Order, In re Rules & Regulations Implementing the*
    *Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015).............8

Plaintiff's Mem. in Supp. of
Mot. for Class Certification
    vi    Case No. 15-CV-04410-CBM-RAO

2012 FCC Order:

*Report & Order, In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830 (2012) ................................. 9, 10, 11

2003 FCC Order

*Report & Order, In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 (2003) ................................. 8, 11, 18


<u>Other Authorities</u>

Fed. R. Civ. P. 23 ................................................................................. passim

Pub. L. No. 102-243, § 2, 105 Stat. 2394 (1991) ....................................... 8

S. Rep. No. 102-178 (1991) ....................................................................... 7

# I.   **INTRODUCTION**

Between June 2011 and July 2016, Defendants made at least 15,288,992 automated telemarketing calls to 1,591,801 unique telephone numbers. The calls were part of an extensive telemarketing program that Defendants refer to as the Acura Client Excellence, or "ACE," program. Under the ACE telemarketing program, Defendants targeted Acura owners who had recently brought their car to an Acura dealership for service. Acura is Honda's luxury brand, and the calls were designed to ensure customer satisfaction and loyalty to the Acura brand, ultimately for the purpose of encouraging repeat business and growing revenue.

While many consumers consider telemarketing to be an "aggravation, nuisance, and an invasion of privacy," *Juarez v. Citibank, N.A.*, No. 16-cv-01984, 2016 WL 4547914, at *3 (N.D. Cal. Sept. 1, 2016), such calls are also illegal if sent to an individual's cellphone without his or her permission. Under the federal Telephone Consumer Protection Act (the "TCPA"), it is unlawful to (1) call a cellphone number (2) using an automatic telephone dialing system ("ATDS") (3) without the recipient's prior express consent. 47 U.S.C. § 227(b)(1)(A)(iii); *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).

After Defendants repeatedly called him over the course of several weeks, Plaintiff brought suit against Defendants for violating Section 227(b)(1)(A)(iii) of the TCPA. (*See* First Amended Class Action Complaint, Dkt. 63) (the "Compl."). Following extensive discovery, Plaintiff now moves to certify a class of similarly situated individuals whose cellphones were also called by Defendants. As explained in detail below, certification under Federal Rule 23 is appropriate here, and Plaintiff can establish Rule 23's prerequisites to certification through objective, classwide proof common to all putative class members.

In this case, evidence obtained through discovery shows that all class members received the same calls as part of the ACE telemarketing program, and that the program remained consistent throughout the class period. Under the program,

Defendants obtained all of the class members' phone numbers in the same way and under similar circumstances—during a service visit to an Acura dealership. Defendants also employed a single calling company to make all of the calls to the class members. This calling vendor used the same dialing system for all calls at issue. Further, during each call, the callers read from the same, prewritten script. In short, Defendants called each class member in the same way, using the same technology, and for the same purposes. This uniformity among the putative class members will enable the Court to resolve all of the important issues in this case in "one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Moreover, Defendants' calling vendor has admitted that it has detailed call records for all ACE telemarketing calls to putative class members. Those records are sufficient to identify who was called, when they were called, and what number they were called on, which simplifies the process of identifying the class members and ascertaining membership in the class.

Even Defendants' potential defenses to liability can be defeated through common proof. For instance, under the TCPA, a defendant may assert as an affirmative defense that the called party gave prior express consent to receive calls. *Grant v. Capital Mgmt. Servs., L.P.*, 449 F. App'x 598, 600 n.1 (9th Cir. 2011). However, for "telemarketing" calls, federal regulations promulgated pursuant to the TCPA require callers to obtain prior express *written* consent from those whom they call. 47 C.F.R. § 64.1200(a)(2). The writing must also be signed and contain a number of mandatory disclosures. *Id.* at § 64.1200(f)(8). Defendants were thus required to collect and maintain a signed written record that complies with TCPA regulations for each putative class member. Nonetheless, despite months of discovery, Defendants have failed to produce even a single example of valid, prior express written consent to receive telemarketing calls. Nor have they shown that they had a corporate policy of requiring dealerships to obtain such consent from Acura customers. The absence of any evidence of prior express written consent

shows that this potential defense will fail as to each putative class member.

At bottom, this case involves a common course of unlawful conduct that Defendants carried out uniformly across the proposed class—exactly the scenario that courts have recognized as appropriate for class treatment. Defendants may wish to contest the merits of the putative class members' TCPA claims, but Defendants will have to concede that the legal and factual bases of those claims are virtually identical. The claims therefore warrant class treatment. Accordingly, Plaintiff respectfully moves for entry of an order granting his Motion for Class Certification, certifying the proposed class under Rule 23(b)(3), and appointing Plaintiff as class representative and Plaintiff's counsel as class counsel.

## II.   FACTUAL BACKGROUND

### A.   Defendants Designed And Implemented A Massive Telemarketing Program.

Defendant American Honda Motor Co., Inc. ("Honda") is the manufacturer of automobiles sold under the Acura brand. (Compl., ¶ 11). To promote its Acura automobiles, Honda contracted with Defendant J.D. Power and Associates ("J.D. Power"), a market research company, to create the Acura Client Excellence program. (*Id.* ¶¶ 13-14). As part of the ACE program, Defendants place telemarketing calls to consumers who have recently brought an Acura automobile to an Acura dealership for service. (*See* Deposition Tr. of Neil Wada, ("Ex. A"), at 31:13-17).[1] Customers' phone numbers are collected by the Acura dealership at the time of their service visit, seemingly so that the dealership can call the customer when the car is ready for pickup. The phone numbers are then extracted by Honda, who transfers them to J.D. Power. (Ex. A at 34:13-21, 38:6-10). J.D. Power processes the customer information and sends it to the calling vendor to place the ACE calls. (*See* Deposition Tr. of Scott Yamaguchi, ("Ex. B"), at 57:7-12).

During the relevant time period, all ACE telemarketing calls were made using

---

[1] Unless otherwise indicated, all references to exhibits (e.g., "Ex. A") are references to the exhibits identified in the Declaration of Evan M. Meyers, filed contemporaneously herewith.

the same or substantially the same call script. (Ex. C at AHM0000036; Ex. B at 33:23-34:16). The script consists of two questions: Customers are first told that "Acura really cares about your experience," and then asked to rate their recent dealership experience on a scale of one to ten. (Ex. C at AHM0000043, 50). The called party is then asked a follow-up question based on the rating. For example, if the called party responds with a number between six and nine, they are told, "To help the dealer provide you with better service, why did you rate this experience a [score]?" (*Id.*).

In addition to generating a vast amount of consumer data about Acura customers, the purpose of the ACE telemarketing calls is twofold: first, they are part of what Honda calls its "concierge experience." (*Id.* at AHM0000047, 49; Ex. A at 71:12-72:1). Acura is Honda's luxury brand, and the phone calls offer what Honda's Rule 30(b)(6) deponent, Neil Wada, described as a "personal touch." (Ex. A at 19:16-20:22; 75:10-15). Defendants believe this personal touch is part of what luxury car owners want, and they designed their telemarketing calls to encourage customer satisfaction and loyalty to the Acura brand—to encourage customers to return to Acura dealerships in the future for repairs or to purchase another Acura automobile. (Ex. C at AHM0000049; Ex. A at 84:5-21).

Second, ACE calls give Honda a way to quickly learn about customers who have had a negative experience at a dealership, so that the dealer can invite the customer back to the dealership to attempt improve that customer's experience. (Ex. C at AHM0000050-51). When a customer gives a negative response to a survey question, Defendants' system creates an "Opportunity Work Bulletin." (*Id.*). Opportunity Work Bulletins are a type of alert that informs the dealer about the customer's negative experience so that the dealer can reach out to the customer and attempt to resolve whatever is bothering him or her. (*Id.*; Ex. B at 46:4-48:5). This process, again, is designed to ultimately promote customer satisfaction and loyalty to encourage customers to repatronize Acura dealerships in the future. (*Id.*).

1
2
3
4
5
6

Although the ACE telemarketing calls are intended to drive customer satisfaction and loyalty, Honda's practical objective is to increase revenue and improve its return on investment. (Ex. A at 76:12-78:17; Ex. B. at 43:11-44:6). It is Honda's hope that customer satisfaction and loyalty translates into repeat business: customers buying another Acura, customers returning to an Acura dealer for service, or customers recommending Acura to friends and family. (*Id.*).

7
8

**B.    Defendants Engaged A Single Calling Vendor To Place All The Automated Telemarketing Calls At Issue.**

9
10
11
12
13

J.D. Power engaged Survey Sampling International, LLC ("SSI") to place the ACE program telemarketing calls. SSI is a calling vendor and market research company that specializes in internet and telephonic surveying of consumers. (Ex. E at SSI_000084). During the class period, SSI was the only calling company that Defendants used to place ACE telemarketing calls. (Ex. B at 52:23-53:7).

14
15
16
17
18
19
20
21
22

SSI only places ACE calls to the phone numbers provided by Defendants. After SSI receives the phone numbers, they are uploaded to a single database. (*See* Deposition Tr. of Troy Lauritzen, ("Ex. D"), at 29:23-30:21). This database only contains phone numbers belonging to Acura customers, and does not contain phone numbers for other clients or other calling campaigns. (*Id.*). After the phone numbers are uploaded to SSI's database, the numbers are sorted using national phone number registries maintained by third-party telecommunications companies and then tagged and labeled as either a landline or cellphone number. (*Id.* at 31:2-32:9; Ex. E at SSI_000087).

23
24
25
26
27
28

SSI uses sophisticated calling technology to rapidly and efficiently place millions of outbound calls every year. (Ex. E at SSI_000084). SSI refers to its calling system as the Computer Assisted Telephone Interviewing system, or "CATI" dialing system. (Ex. E at SSI_000084-97, 115-131). CATI is comprised of numerous components, including hardware, software, and automated dialing technology. (*Id.*). During calls with Acura customers, SSI calling agents sit at a computer terminal and

read call scripts previously provided to SSI by Defendants. (Exh. C at AHM0000043; Ex. B. at 34:2-35:14). All calls that SSI made to cellphone numbers as part of the ACE telemarketing program utilized identical or substantially identical call scripts, and were made using the same functions and technological components of the CATI system. (Ex. D. at 76:4-19).

Records produced in response to a subpoena to SSI show that, between June 2011 and July 2016, SSI placed 15,288,992 calls to 1,591,801 unique telephone numbers. (Ex. F at SSI_000133). After placing a call, SSI records the date and time of when the call occurred, the number called, the name associated with that number, and how the call was dispositioned (e.g. answering machine, no answer, etc.). (*Id.* at SSI_000132). SSI maintains such records for all ACE calls it placed during the relevant time period. (Ex. B. at 50:16-24; Ex. D. at 72:21-74:57).

### C.    Facts Specific To Plaintiff.

In 2015, Plaintiff owned an Acura automobile. (Compl., ¶ 18; Declaration of Samuel Katz ("Katz. Decl."), attached hereto, ¶ 5). In March 2015, Plaintiff brought his Acura to Sunnyside Acura of Nashua New Hampshire—an Acura dealership— to have the car serviced. (Compl., ¶ 19; Katz Decl., ¶ 6). In connection with the visit, the dealership obtained Plaintiff's phone number to call Plaintiff to let him know when his car was ready to be picked up. (Compl., ¶ 20).

At no point during Plaintiff's service visit to the Acura dealership did he consent to receive automated telemarketing calls. (Katz Decl., ¶¶ 7-8). Plaintiff was never made aware of the ACE Program. (*Id.*). Nor was he informed that his phone number would later be sent to Honda or J.D. Power so that they could call him to solicit information about his experience at the dealer. (*Id.*). Had the dealer asked Plaintiff if he wanted to receive automated telemarketing calls from Honda or anyone else, Plaintiff would have unequivocally said no. (*Id.*).

In the weeks following his service visit to the Acura dealership, Plaintiff began receiving phone calls on his cellphone from the telephone number 410-774-

8480, a number that he did not immediately recognize. (Compl., ¶ 23; Katz Decl., ¶ 9). Plaintiff received the first of these calls on March 17, 2015. (Compl., ¶ 21; Katz Decl., ¶ 9). Over the following weeks, Plaintiff continued to receive calls from the same number, including on March 19, twice on March 20, March 21, and March 25. (Compl., ¶ 22; Katz Decl., ¶ 9; Ex. F at SSI_000132).

Each such call invaded Plaintiff's privacy and was a nuisance. (Compl., ¶ 27; Katz Decl., ¶¶ 10-11). Plaintiff remembers receiving the calls and how they caused an annoying interruption of his activities. (Katz Decl., ¶¶ 10-11). Each time Plaintiff received one of the calls, he was either at work or spending time with his family, and he had to step away from what he was doing to try and figure out who was calling him and how to make the calls stop. (*Id.*). After receiving these calls, Plaintiff learned that the calls were coming from Honda, and that they were the same automated ACE calls that Defendants make to other consumers who have had their cars serviced at an Acura dealership. (*Id.* ¶ 9).

## III.   STATUTORY AND REGULATORY BACKGROUND

### A.   Defendants' Telemarketing Calls Are Unlawful Under The Federal Telephone Consumer Protection Act.

Seeking to protect consumers against a growing flood of invasive and unwanted telemarketing calls, in 1991 Congress enacted the Telephone Consumer Protection Act to "ban all autodialed calls . . . [to] cellular phones . . . unless the called party consents to receiving them, or unless the calls are made for emergency purposes[.]" S. Rep. No. 102-178, at 6 (1991); *see also Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 742 (2012). Based on an extensive legislative record, Congress found that consumers "consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy," and that "[b]anning such automated or prerecorded calls . . . except when the receiving party consents to receiving the call . . . is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." Pub. L.

No. 102-243, § 2(10), 2(12), 105 Stat. 2394 (1991); *Mims*, 132 S. Ct. at 745 ("Congress reported, '[m]any consumers are outraged over the proliferation of intrusive, nuisance [telemarketing] calls[.]'").

The problems that Congress sought to address by enacting the TCPA have grown only worse in recent years as the use of automated calls has continued to expand. When Congress enacted the TCPA in 1991, telemarketers called more than 18 million Americans every day. Pub. L. No. 102-243, § 2(3), 105 Stat. 2394 (1991). By 2003, telemarketers were calling 104 million Americans every day, abetted by the proliferation of new and more powerful automated calling technology. (2003 FCC Order, ¶¶ 2, 8).[2] Despite the establishment of a national do-not-call list and other efforts to reduce intrusive telemarketing, unwanted calls remain a top consumer complaint. (2015 FCC Order, ¶ 5) ("By the fourth quarter of 2012, robocall complaints had peaked at more than 200,000 per month").[3]

Unwanted calls are especially problematic when made to cellphones, which are now ubiquitous among consumers. "People keep their cellular phones on their person at nearly all times: in pockets, purses, and attached to belts." *Joffe v. Acacia Mortg. Corp.*, 121 P.3d 831, 842 (Ariz. Ct. App. 2005). Calls to cellphones not only invade the sanctity of the home, but also reach into individuals' pockets and can create an interruption at any moment—at home, at work, in the car, on vacation, or during private moments.

To address the problems associated with automated calls, Section 227(b)(1) of the TCPA "prohibits persons from (1) making any call, (2) using any automatic telephone dialing system . . . (3) to any telephone number assigned to a . . . cellular telephone service[.]" *Grant*, 449 F. App'x at 600 (internal quotation marks omitted). While the TCPA restricts automated calls to cellphones, it does not ban automated

---

[2] *Report & Order, In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 (2003) ("2003 FCC Order").

[3] *Declaratory Ruling & Order, In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) ("2015 FCC Order").

calling entirely. Rather, telemarketers may make automated calls to individuals' cellphones without violating the TCPA so long as they obtain the called parties' express consent in advance of making the call. *See* § 227(b)(1)(A) (exempting from liability those calls made with "the prior express consent of the called party"). Accordingly, courts have held that the existence of the called party's valid "[p]rior express consent is an affirmative defense under the TCPA." *Lee v. Global Tel*Link Corp.*, No 2:15-cv-02495-ODW-PLA, 2016 WL 6237896, at *4 (C.D. Cal. Feb. 5, 2016) (collecting sources). And as with other affirmative defenses, the defendant bears the burden of proof on consent issues. *Id.*; *Charkchyan v. EZ Capital, Inc.*, No. 2:14-cv-03564, 2015 WL 3660315, at *3 (C.D. Cal. June 11, 2015).

**B.    FCC Regulations Promulgated Pursuant To The TCPA Require Defendants To Have Obtained The Class Members' Express Written Consent Prior To Sending Them Telemarketing Calls.**

The Federal Communications Commission ("FCC") is the federal agency charged with instituting regulations to implement the TCPA. 47 U.S.C. 227(b)(2). In 2012, in response to an increasing number of consumer complaints and growing frustration over unwanted telemarketing calls, the FCC promulgated new regulations that heightened existing consumer protections against telemarketing calls. (2012 FCC Order, ¶ 20).[4] The new regulations went into effect on October 16, 2013 and require that companies obtain consumers' "prior express *written* consent" for all calls and messages that constitute "telemarketing" as defined in 47 C.F.R. § 64.1200(f)(12). The FCC explained the rationale of the new written consent requirement as follows:

> We believe that requiring prior written consent will better protect consumer privacy because such consent requires conspicuous action by the consumer – providing permission in writing – to authorize autodialed or prerecorded telemarketing calls, and will reduce the chance of consumer confusion in responding orally to a telemarketer's consent request.

---

[4] *Report & Order, In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991,* 27 FCC Rcd. 1830 (2012) ("2012 FCC Order").

1    (2012 FCC Order, ¶ 24).

2         FCC regulations define "telemarketing" broadly as any telephone call or

3    message sent "for the *purpose* of encouraging the purchase or rental of, or

4    investment in, property, goods, or services." § 64.1200(f)(12) (emphasis added).

5    Courts have observed that this definition focuses "not on the caller's characterization

6    of the call, but on the *purpose* of the message." *Chesbro v. Best Buy Stores, L.P.*,

7    705 F.3d 913, 918 (9th Cir. 2012) (emphasis added). In examining whether a call

8    was carried out with a telemarketing purpose, courts generally look to the context

9    surrounding the calls. *Golan v. Veritas Entertainment, LLC*, 788 F.3d 814, 820 (8th

10   Cir. 2015). In other words, courts evaluate the facts and circumstances surrounding

11   the calling campaign "with a measure of common sense," and do not merely take a

12   defendant at its word. *Id.*; *Bennett v. Boyd Biloxi, LLC*, No. 14-0330-WS-M, 2015

13   WL 2131231, at *3 (S.D. Ala. May 6, 2015).

14        In this case, Defendants' ACE program calls constitute "telemarketing" and

15   are therefore subject to the FCC's telemarketing regulations. As explained above,

16   Defendants created the ACE Program to deliver a "concierge experience" and

17   promote customer satisfaction, with the ultimate goal of encouraging loyalty to the

18   Acura brand and repeat business in the future. *See supra* Part II.A. Defendants also

19   used the ACE calls to alert dealerships about particular customers who may have

20   had a negative experience, so that the dealers could specifically invite that customer

21   to return to the dealer. *Id.* The objectives of the ACE program and the context

22   surrounding the calls demonstrate that the purpose of the program was to

23   "encourag[e] the purchase or rental of . . . property, goods, or services" from Acura

24   dealers. § 64.1200(f)(12); *Chesbro*, 705 F.3d at 918 ("Because the calls encouraged

25   recipients to engage in future purchasing activity, they [] constituted

26   telemarketing[.].").

27        Defendants may assert that the ACE calls are not telemarketing calls, arguing

28   the calls' primary purpose was merely to gather information, and not to encourage

the purchase of goods and services from Acura dealerships. Even if this were true, it would not allow Defendants to escape compliance with the FCC's telemarketing regulations. Telemarketing need only be *a* purpose of a call in order to subject it to the FCC's telemarketing regulations—it need not be the sole or even the primary purpose. Indeed, the FCC and the Ninth Circuit have explicitly held that calls are subject to the FCC's telemarketing regulations even where they have a "dual-purpose"—that is, they have "both a customer service or informational component as well as a marketing component." *Chesbro*, 705 F.3d at 917-18; *Meyer v. Bebe Stores, Inc.*, No. 14-cv-00267, 2015 WL 431148, at *3 (N.D. Cal. Feb. 2, 2015); (2012 FCC Order, ¶ 30); (2003 FCC Order, ¶ 142).

Defendants may also argue that the ACE calls had no telemarketing purpose, because no goods or services were offered during the calls themselves. This argument fails as well and has already been rejected by the Ninth Circuit. "Neither the [TCPA] nor the [FCC] regulations require an explicit mention of a good, product, or service where the implication is clear from the context." *Chesbro*, 705 F.3d at 918; *Golan*, 788 F.3d at 820 (rejecting the defendant's argument that only a call's content should be considered in determining whether it constitutes "telemarketing"); *see also Bennett*, 2015 WL 2131231, at *3.

In the context of the ACE Program, Defendants' calls constitute telemarketing, and Defendants were therefore required to obtain the class members' express *written* consent before calling them. Nonetheless, the Court need not inquire into whether Defendants actually attempted to obtain individuals' written consent in compliance with the TCPA. Despite months of discovery, Defendants have failed to produce even a single record of valid prior express written consent that complies with the FCC's telemarketing regulations. As such, no inquiry by the Court is necessary. It is sufficient for purposes of class certification to note that the *same* consent standard applies to *all* class members, and Defendants failed to meet that standard with respect to each class member. As explained in more detail below,

Defendants' uniform failure to comply with the FCC's written consent regulations simplifies this Court's Rule 23 analysis.

## IV. <u>ARGUMENT</u>

Federal Rule of Civil Procedure 23 governs class certification. Parties seeking certification must satisfy two conditions: First, the movant must meet each of the four criteria in Rule 23(a)—numerosity, commonality, typicality, and adequacy. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). Second, the proposed class must fit into at least one of the categories of Rule 23(b). *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). Here, Plaintiff seeks certification under Rule 23(b)(3), which requires that common questions of law or fact predominate over individualized issues and that maintenance of the suit as a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3).

### A. **Plaintiff's Proposed Class Definition.**

All individuals in the U.S. whose cellphone number(s) were called by or on behalf of Defendants, where such call(s) were made between October 16, 2013 and the present, were placed by Survey Sampling International, LLC, and were made pursuant to Defendants' Acura Client Excellence Program.[5]

---

[5] This proposed class definition is a modified version of the one pled in Plaintiff's Complaint (*see* Compl. ¶ 32). It is narrower and incorporates specific information obtained through discovery. Altering a class definition over the course of litigation is permitted and expressly contemplated under the Federal Rules. *See* Fed. R. Civ. P. 23(c)(1)(C) (a certification order "may be altered or amended before final judgment"); *Dukes v. Wal-Mart Stores, Inc.*, No. 01-cv-02252, 2012 WL 4329009, at *4 (N.D. Cal. Sept. 21, 2012) (courts often "permit renewed certification motions that set out a narrower class definition or that rely upon different evidence or legal theories."); *Brown v. Hain Celestial Group, Inc.*, No. 11-cv-03082, 2014 WL 6483216, at *6 (N.D. Cal. Nov. 18, 2014) ("[c]ourts . . . regularly allow class definitions to be adjusted over the course of a lawsuit."). Further, a proposed class definition may be revised in the class certification motion itself. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 594 (N.D. Cal. 2010); *Heffelfinger v. Elec. Data Sys. Corp.*, No. 07-cv-00101, 2008 WL 8128621, *10 (C.D. Cal. Jan. 7, 2008) ("the court has discretion either to redefine the class or to afford plaintiffs an opportunity to do so."). If the Court so requires, Plaintiff will seek leave to amend the Complaint to conform the class definition to the one proposed above. *See Akaosugi v. Benihana Nat. Corp.*, 282 F.R.D. 241, 253 (N.D. Cal. 2012).

**B.     The Proposed Class Is Ascertainable Based On Objective Criteria, Because Defendants' Call Records Identify All Class Members Who Received Unlawful Telemarketing Calls On Their Cellphones.**

Although not explicitly listed in Rule 23, courts in this District require that a proposed class be ascertainable. *Petersen v. Costco Wholesale Co., Inc.*, 312 F.R.D. 565, 575 (C.D. Cal. 2016). A class is ascertainable where "the class definition identifies putative class members by objective characteristics," such that it "allows prospective plaintiffs to determine whether they are class members with a potential right to recover." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 566 (C.D. Cal. 2014) (citations and internal quotation marks omitted); *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 660 (S.D. Cal. 2010). However, the class definition need not be so precise that each individual member can be identified. *Briseno v. ConAgra Foods, Inc.*, -- F.3d --, 2017 WL 24618, at *10 (9th Cir. 2017) ("Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification"); *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) (same). Rather, a class is sufficiently ascertainable "[a]s long as the general outlines of the membership of the class are determinable[.]" *Id.*

Here, Plaintiff's proposed class satisfies the ascertainability requirement, because it is defined in terms of objective criteria. These criteria include: whether an individual was called by SSI; whether the phone number that SSI called was a cellphone number; whether call(s) were placed to that number between October 16, 2013 and the present; and whether the call(s) were placed as part of Defendants' ACE telemarketing campaign. *See supra* part IV.A. Each of these criteria is verifiable through objective facts contained in Defendants' records and SSI's call logs. As shown by SSI's call records for the Plaintiff—and the testimony of Mr. Lauritzen about those records—SSI keeps detailed call logs of ACE calls. (*See* Ex. B. at 50:16-24; Ex. D. at 72:21-74:57). Those logs contain the information needed to identify individual class members. Importantly, these records exist for each

putative class member and are in the possession of a single company—SSI. (*Id.*). Further, the attached declaration of Plaintiff's proposed claims administrator, Epiq Systems, Inc. ("Epiq"), shows that such records have been previously utilized to identify class members and their contact information for purposes of effectuating individual notice for several previously certified TCPA class actions. (*See* Declaration of Cameron Azari, ("Azari Decl."), attached hereto, ¶¶ 9-19).

Because SSI's call logs are sufficient to identify the putative class members who make up the proposed class, the class is ascertainable through objective, class-wide proof. *Abdeljalil v. General Elec. Capital Corp.*, 306 F.R.D. 303, 307 (S.D. Cal. 2015) (finding that a TCPA class defined in terms of the defendant's call records was ascertainable); *Bee, Denning, Inc. v. Capital Alliance Group*, 310 F.R.D. 614, 623-24 (S.D. Cal. 2015) (same); *see Pryor v. Aerotek Scientific, LLC*, 278 F.R.D. 516, 523 (C.D. Cal. 2011) ("all the parameters for membership in this class are objective criteria, and defendants' business records should be sufficient to determine the class membership status of any given individual."). Using SSI's records and call logs, "the parties should be able to determine who is and who is not in the class[.]" *Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. at 660. The proposed class is, thus, sufficiently ascertainable.

## C.   The Proposed Class Meets The Four Requirements Of Rule 23(a).

### i.   *Numerosity.*

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). To satisfy the numerosity requirement, a plaintiff "do[es] not need to state the exact number of potential class members, nor is a specific number of class members required[.]" *In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. 346, 350-51 (N.D. Cal. 2005); *Saulsberry v. Meridian Fin. Servs., Inc.*, No. CV 14-6256, 2016 WL 3456939, at *7 (C.D. Cal. April 14, 2016) ("Courts have not required evidence of exact class size or the identities of class members to satisfy the requirements of Rule 23(a)(1)."). Although there is no

particular number or cut-off necessary to satisfy Rule 23(a)(1), courts generally hold that a class is sufficiently numerous where it comprises more than 40 members. *See, e.g., In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 116 (C.D. Cal. 2007). As such, classes that number in the thousands "plainly" meet the numerosity requirement. *See, e.g., Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, 560 (C.D. Cal. 2012) (finding that proposed TCPA class "plainly" met the numerosity requirement where the defendant sent tens of thousands of fax advertisements to putative class members); *Steinfeld v. Discover Fin. Servs.*, No. C 12-01118, 2014 WL 1309352, *3 (N.D. Cal. March 13, 2014).

As an initial matter, during the Parties' meet-and-confer, counsel for Defendants represented that Defendants do not plan to oppose certification on the basis of numerosity. Even so, discovery shows that the proposed class far exceeds the requirements for numerosity. SSI's call logs show that Defendants made millions of calls to about 1.6 million unique telephone numbers between June 2011 and July 2016. (Ex. F at SSI_000133). The class will therefore be sufficiently numerous even though Defendants have yet to produce information identifying the precise number of class members.[6] *See Roy v. County of Los Angeles*, Nos. CV 12-09012-BRO (FFMx), CV 13-04416-BRO (FFMx), 2016 WL 5219468, at *11 (C.D. Cal. Sept 9, 2016) ("Even where the class size is unknown but 'common sense indicate[s] that it is large, the numerosity requirement is satisfied.'").

In addition to their sheer number, the class members are also geographically dispersed throughout the United States. The ACE Program involves calls to consumers across the country, which further exacerbates the impracticability of joinder and weighs in favor of a finding that the class is sufficiently numerous. *See Greko v. Diesel U.S.A., Inc.*, 277 F.R.D. 419, 425-26 (N.D. Cal. 2011) ("the class members are geographically dispersed . . . which favors class treatment).

---

[6] The class would likely still number in the hundreds of thousands even if, during the claims process, the Parties learn that multiple phone numbers belong to the same individual, or that a significant portion of the numbers called are landline numbers.

### ii.   *Commonality.*

The second prerequisite of Rule 23(a) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement is met where the putative class members share a "common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. However, a plaintiff "need not show that every question in the case, or even a preponderance of questions, is capable of classwide resolution. So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013) (quoting *Dukes*, 564 U.S. at 359); *see Meyer*, 707 F.3d at 1041 ("The existence of shared legal issues with divergent factual predicates is sufficient [to satisfy commonality], as is a common core of salient facts coupled with disparate legal remedies within the class." (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998))).

In this case, there is a very high degree of commonality among the putative class members. Plaintiff and all other class members assert the same claim—that Defendants violated Section 227(b)(1)(A) of the TCPA by using an ATDS to call their cellphones without prior express written consent. Accordingly, the legal questions involved in resolving the class members' claims are identical. Further, all class members' claims arise out of the same, uniform set of facts: each class member received the same calls, all of which featured the same script pursuant to the same ACE telemarketing program. Moreover, all of the calls were placed by the same calling vendor using the same equipment and calling system.

Due to the many similarities among the putative class members, there are several significant common questions of law or fact, including:

**1.   Did Defendants place calls to the class members' cellular telephone numbers?** Robocalls are actionable under Section 227(b)(1)(A)(iii) of the TCPA if

the calls were made to a "telephone number assigned to a . . . cellular telephone service[.]" 47 U.S.C. 227(b)(1)(A)(iii). The question of whether a given telephone number is a cellphone or landline number is a question of fact, and here that question can be answered in the affirmative for each class member through the use of classwide proof. Defendants' calling vendor, SSI, has admitted that all phone numbers in its project databases are tagged and identified as either a landline or cellphone number. (Ex. D. at 31:2-32:9). The Parties can therefore use SSI's call records to isolate cellphone numbers that Defendants called.[7]

**2.     Is the calling system that Defendants' vendor used to place the ACE telemarketing calls an "ATDS" under the TCPA?** There is no dispute in the record that SSI is the only calling vendor that Defendants contracted with to place ACE telemarketing calls, and that SSI used a single system—its CATI dialing system—to place all such calls. (*See* Ex. D. at 76:4-19). Through discovery, SSI has produced information showing that its CATI dialing system has the capacity to autodial phone numbers and is thus an ATDS. (*See generally* Ex. E at SSI_000084-131). More precisely, discovery shows that the CATI dialing system has the capacity to predictively dial telephone numbers—a function that the FCC and courts have specifically identified as falling within the definition of ATDS under the TCPA. (*Id.*); (2003 FCC Order, ¶ 133); *Meyer*, 707 F.3d at 1043.

For purposes of class certification, however, the Court need not rule on the merits of whether the CATI dialing system is an ATDS. The answer to the ATDS question will ultimately be yes or no. More importantly, however, the answer will be the same for each class member, because Defendants called each individual using the same system. Even if Defendant disagrees that the CATI dialing system is an ATDS, Defendant cannot deny that all ACE calls to cellphones were made in the

---

[7] If necessary, the Parties can also engage third-party services to verify whether the telephone numbers of putative class members are indeed cellphone numbers. Such services can cross-check any phone numbers against national cellphone number databases maintained by organizations in the telecommunications industry.

same way. The ATDS issue is thus a common question.

**3.     Did the telephone calls made pursuant to the ACE program constitute "telemarketing," as defined under § 64.1200(f)(12)?** As stated above, telephone calls constitute telemarketing if they were made "for the *purpose* of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(12) (emphasis added). Courts determine the purpose(s) of a call by looking at the context in which the call was made. *Chesbro*, 705 F.3d at 918. Here, Defendants made all of the calls at issue pursuant to a single, uniform corporate program—the ACE telemarketing program. As such, the Court can ascertain the purpose of the ACE calls by looking at the purposes and objectives of the program itself. And because the ACE program and ACE calls have remained substantially similar over the class period, the purpose of each call was the same for each class member. As a result, the determination as to whether the ACE calls constitute telemarketing applies uniformly to each class member.

Again, the Court need not conclusively determine whether Defendants' calls constitute telemarketing for purposes of this Motion. Rather, to establish commonality, it is sufficient that the same FCC regulations and same telemarketing standard will apply to issues surrounding the purposes of the ACE calls.

**4.     Did Defendants obtain prior express written consent from the individuals whom they called?** If the calls to the putative class members constitute "telemarketing" as defined in the FCC's regulations, then Defendants were required to obtain the called parties' "prior express written consent" before making ACE calls to the class members' cellphones. FCC regulations define the phrase "prior express written consent" as:

> [A]n agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

47 C.F.R. § 64.1200(f)(8). The signed writing also must include a number of disclosures. *Id.* § 64.1200(f)(8)(i).

Because consent is an affirmative defense under the TCPA, *Grant*, 449 F. App'x at 600 n.1, it is ultimately Defendants' burden to come forward with evidence of a signed writing containing the required disclosures in compliance with FCC regulations. *Ott v. Mortg. Investors Corp. of Ohio, Inc.*, 65 F. Supp. 3d 1046, 1067 (D. Or. 2014) ("unless and until [defendant] comes forward with some evidence that it received prior express consent before it called putative class members, there is no barrier to certification."); *Saulsberry*, 2016 WL 3456939, at *9 ("[F]rom a practical standpoint, Defendant is in a better position to prove that consent was given because it would be impossible for any individual consumer to prove that he did not give consent. . . . [Defendant] will have the burden to prove that express consent was given."). To date, however, Defendants have failed to produce even a single example of a putative class member who gave valid, prior express written consent to receive telemarketing calls.[8] Based on the absence of any valid prior express written consent, the Court can infer that this fact is common among the putative class members. *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1305 (D. Nev. 2014) ("The Ninth Circuit has held that in the absence of any evidence of consent by the defendant, consent is a common issue with a common answer" citing *Meyer*, 707 F.3d at 1036)).

Many courts in other TCPA cases have concluded that the issues discussed above are sufficient to satisfy the commonality standard. Here, because Plaintiff's "allegation is not merely that all class members suffered a violation of the TCPA,

---

[8] To the extent that Defendants may have obtained valid, prior express written consent from some individuals, those people can be identified during claims administration and excluded from the class. *See Booth*, 2015 WL 1466247, at *5 ("It 'is not fatal for class definition purposes if a court must inquire into individual records, so long as the inquiry is not so daunting as to make the class definition insufficient'" (quoting *Agne*, 286 F.R.D. at 566)); *Stonebridge*, 289 F.R.D. at 295 ("merits discovery should reveal [whether any class members consented], with whatever consequences that may then have to the size of the class[.]").

but rather that all class members were sent substantially similar unsolicited [calls] by the same defendants, using the same automatic dialing technology, commonality is satisfied." *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 567 (W.D. Wash. 2012); *Booth v. Appstack, Inc.*, No. C13-1533, 2015 WL 1466247, at *8 (W.D. Wash. March 30, 2015) ("class members' TCPA claims are predicated on a common course of conduct by [defendant]: the use of the same predictive dialer to robocall . . . various cell phone numbers. As such, these claims implicate questions of law and fact that can be resolved in one stroke"), *modified in part*, 2016 WL 3030256. Therefore, the sheer number and significance of the common questions that exist in this case are sufficient to meet the commonality requirement.

### iii.    *Typicality.*

The typicality prong of subsection 23(a)(3) requires that the class representative's claims be typical of the class members' claims. Fed. R. Civ. P. 23(a)(3). Under Rule 23(a)'s "permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020; *see also Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992) ("Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought."). In determining whether typicality is satisfied, courts consider a number of factors, including "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508.

In TCPA class actions like this one, the typicality requirement is generally met where the named plaintiff and the class members all received the same calls as part of the same telemarketing campaign. *Booth*, 2015 WL 1466247, at *9 (finding that the class representatives' TCPA claims were "reasonably co-extensive" with the class members' claims where "the other class members have received and been

injured by the same robocalls"); *Kristensen*, 12 F. Supp. 3d at 1305 ("[Plaintiff] and the purported class members allegedly received identical text messages from the same senders in a specified time period. This is more than sufficient for typicality"); *Stern v. DoCircle, Inc.*, No. SACV 12-2005, 2014 WL 486262, at *5 (C.D. Cal. Jan. 29, 2014) ("The unnamed class members received text messages identical or similar to those received by Plaintiff[ a]nd . . . were caused by the same course of conduct. That is sufficient for typicality"). In such cases, courts have found that a uniform calling campaign supports a finding of typicality, because it shows that the "Defendant[s] engaged in a standardized course of conduct vis-a-vis the class members, and the [named] Plaintiff's alleged injury arises out of that conduct[.]" *Meyer v. Portfolio Recovery Assocs., LLC*, No. 11cv1008, 2011 WL 11712610, at *3 (S.D. Cal. Sept 14, 2011).

Here, as in the cases cited above, Plaintiff's claims are coterminous with the claims of the members of the proposed class. Because Plaintiff and the putative class members have all received one or more ACE Program telemarketing calls, they all have TCPA claims with identical legal and factual predicates. Specifically, all of the telemarketing calls placed to Plaintiff and the other class members contained the same script and were made pursuant to a single, uniform telemarketing program—the ACE Program. Further, all of the telemarketing calls were placed by a single third-party, SSI, using that company's automated CATI dialing system. Finally, Plaintiff and the putative class members have all suffered the same injury: a violation of their rights protected under the TCPA. Because Plaintiff and the class members' TCPA claims are based on the same legal theory and arise out of the same facts, the same course of conduct by the Defendants, and seek redress for the same injury, Plaintiff is typical of the proposed class.

### iv.   *Adequacy.*

The final subsection of Rule 23(a) requires that the class representative "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *Staton v.*

*Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). This requirement has two parts. "First, the named representatives must appear able to prosecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class." *Wyatt v. Creditcare, Inc.,* 04-03681, 2005 WL 2780684, at *5 (N.D. Cal. Oct. 25, 2005) (quoting *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)).

Mr. Katz satisfies the first component of adequacy, because he has actively participated in this litigation, and he is dedicated to vigorously prosecuting the case. (Katz Decl., ¶¶ 2-4). Plaintiff takes his role as class representative seriously, and he is committed to protecting the class members' interests. (*Id.*). Further, Plaintiff has remained engaged with this case and his counsel throughout the course of the litigation, filing the case in his own name, responding to discovery requests, appearing for a deposition, and subpoenaing his phone records from his cellphone carrier for Defendants' inspection. (*Id.*). Mr. Katz's pursuit of this matter demonstrates that he has and will continue to zealously advocate for the class.

Mr. Katz also meets the second component of adequacy, because he is a member of the proposed class and has the same interests as the other class members. As explained above, discovery shows that Plaintiff received the same ACE telemarketing calls as the class members. He did not consent to receive those calls, and he thus suffered the same injury as the class members: a violation of his statutory rights under the TCPA. And, as with the other class members, records of the ACE Program calls that Defendants made to Plaintiff appear in SSI's call logs. (Ex. F at SSI_000132). In short, Plaintiff's interests in pursuing this lawsuit are the same as the absent class members, and he therefore has no interests that are antagonistic to the interests of the proposed class.

Further, Plaintiff's proposed class counsel, Myles McGuire, Evan Meyers and Paul Geske of McGuire Law, P.C., are adequate counsel for the class. They have regularly engaged in major complex litigation and have extensive experience in

consumer class action lawsuits involving the TCPA and telecommunications technology. (*See* Meyers Decl., ¶¶ 5-8). Plaintiff's counsel and their associated firms have been appointed as class counsel in many complex consumer class actions, including similar TCPA cases. (*Id.*). Accordingly, Plaintiff and Plaintiff's counsel will adequately represent the proposed class.

### D.   Plaintiff's Proposed Class Is Certifiable Under Rule 23(b).

A class is certifiable under Rule 23(b)(3) where "questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### i.   *Common questions of law or fact predominate here due to the uniformity of Defendants' telemarketing campaign.*

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010). Where "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," there is "clear justification" for granting certification. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012) (internal quotation marks and citations omitted). "Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (internal quotation marks omitted).

In this case, common questions predominate as to all elements of the putative class members' TCPA claims. Because all of the calls at issue were made as part of a uniform telemarketing program carried out by a single calling company, the elements of the class members' TCPA claims and the facts underlying those claims are virtually identical. *See Silbaugh v. Viking Magazine Servs.*, 278 F.R.D. 389, 393-94 (N.D. Ohio 2012) (finding that common questions predominated where the

"defendant set up a single text message marketing campaign . . . which was conducted in the same manner with respect to all of the class members"); *Vasco v. Power Home Remodeling Group LLC*, No. 15-4623, 2016 WL 5930876, at *4 (E.D. Penn. Oct. 12, 2016) (certifying TCPA class for purposes of settlement where the defendant "engaged in a common course of conduct by making unsolicited telemarketing calls to the Class Members.").

All of the elements of the class members' TCPA claims can be established through common proof, namely, SSI's records. *See Kristensen*, 12 F. Supp. 3d at 1306 ("[a]n issue is common if (1) it is susceptible to generalized, class-wide proof; or (2) if the same evidence will suffice for each member to make a prima facie showing of that issue."). SSI's calling logs are sufficient to show whether a class member was called within the class period and whether that call was made to a cellular number. Neither of these questions requires individualized proof and are, thus, both common questions. *See, e.g., Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 253 (N.D. Ill. 2014) (a "common question among class members is whether they received calls fitting the description in the class definition[]").

The ATDS issue is also a common question that supports a finding of predominance. *Kristensen*, 12 F. Supp. 3d at 1306 ("whether the equipment used to send the text messages is an ATDS, as defined by statute," is a common question). Defendants only used one calling company—SSI—to place ACE telemarketing calls, and SSI has admitted that it placed all such calls the same way using the same technology: the CATI dialing system. *See supra* Part II.B. Accordingly, there is no need for an individualized inquiry as to whether each putative class member was called using an ATDS. *See Silbaugh*, 278 F.R.D. at 392.

Defendants may wish to contest liability on the basis of whether SSI's calling system is an ATDS—or any other potentially dispositive issue—and they are free to do so in their summary judgment motion. For purposes of the predominance requirement, however, Plaintiff need not establish that he will ultimately prevail on

any particular issue. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (a plaintiff "need not . . . prove that the predominating question will be answered in their favor."). Defendants cannot deny that the ATDS issue, like the other elements of the class members' claims, favors predominance, because "[c]lass members will either prevail or lose on this question together." *Van Patten v. Vertical Fitness Grp.*, No. 12cv1614, at 4 (S.D. Cal. Nov. 8, 2013).

In addition to the elements of the class members' claims, Defendants' potential defense of prior express written consent is also common to the putative class members and thus also supports a finding of predominance. First, this defense is applicable to all of the putative class members, so it is a common issue. *Birchmeier*, 302 F.R.D. at 253. Second, unlike the prima facie elements of Plaintiff's claims, this issue is an affirmative defense on which Defendants bear the burden of proof. As such, Plaintiff need not prove lack of prior express written consent—it is impossible to actually prove the absence of something. *Saulsberry*, 2016 WL 3456939, at *9 ("from a practical standpoint, Defendant is in a better position to prove that consent was given because it would be impossible for any individual consumer to prove that he did not give consent."). Rather, Plaintiff need only show that Defendants' consent defense is defeasible through "theories applicable to the entire class." *Kristensen*, 12 F. Supp. 3d at 1307.

Here, this process is streamlined because Defendants have failed to produce any evidence whatsoever of valid, prior express written consent to be sent telemarketing calls. Nor have Defendants shown that they had any corporate policy of requiring Acura dealerships to obtain prior express written consent from their customers. Under these circumstances, "[t]he Ninth Circuit has held that in the absence of any evidence of consent by the defendant, consent is a common issue with a common answer." *Id.*; *Ott*, 65 F. Supp. 3d at 1067 ("unless and until [defendant] comes forward with some evidence that it received prior express consent before it called putative class members, there is no barrier to certification."); *see*

*Silbaugh*, 278 F.R.D. at 393 ("[defendant] admitted . . . that he did not have consent from any person, or take steps to confirm that consent was made. Having produced no evidence . . . defendant is unable to realistically argue that individual issues regarding consent outweigh the commonality."). Holding otherwise would perversely immunize Defendants from classwide TCPA liability as a reward for failing to obtain and maintain records of written consent. *Saulsberry*, 2016 WL 3456939, at *9.

To the extent that Defendants attempt to come forward with previously-undisclosed evidence that some putative class members may have provided prior express written consent, it would not defeat predominance or preclude class certification. Since "the question of consent may rightly be understood as a common question[,] the possibility that some class members may have consented is not sufficient to defeat class certification." *Green v. Serv. Master On Location Servs. Corp.*, No. 07 C 4705, 2009 WL 1810769, at *2 (N.D. Ill. June 22, 2009) (internal quotation marks omitted) (quoting *Hinman v. M & M Rental Ctr.*, 545 F. Supp. 2d 802, 806 (N.D. Ill. 2008)). Any putative class members who may have previously provided written consent can simply be excluded from the class. *Saulsberry*, 2016 WL 3456939, at *10 ("To the extent that [defendant] can provide evidence that some [class members] did give consent, those consumers will be excluded from the class."); *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 648 (W.D. Wash. 2007) (excluding individuals whose claims were subject to a unique defense). Since prior express written consent necessarily implies the existence of a writing, the Parties can simply agree to exclude anyone from whom Defendant has proof of valid written express consent. *See Van Patten*, 12cv1614-LAB (MDD), at 12 (discussing how individuals can be excluded from the class by "screening" customer forms for any notation of consent).

### ii. *A class action is the most efficient way of resolving the putative class members' claims and is superior to a multitude of individual lawsuits.*

To be certified under Rule 23(b)(3), "a class action must also be superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3). Certification under Rule 23(b)(3) is superior "whenever the actual interests of the parties can be best served by settling their differences in a single action." *In re Ferrero Litig.*, 278 F.R.D. 552, 559 (S.D. Cal. 2011) (citing *Hanlon*, 150 F.3d at 1022)). "Considerations relevant to this inquiry include the class members' interest in individually controlling the prosecution or defense of separate actions and the likely difficulties in managing a class action." *Bee*, 310 F.R.D. at 629 (internal quotation marks omitted) (citing Fed. R. Civ. P. 23(b)(3)).

In TCPA cases, like many other consumer class actions, there is no real alternative to the class action device due to the "disparity between [the class members'] litigation costs and what they hope to recover." *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001). "This disparity between litigation costs and prospective recovery provides the most compelling rationale for finding superiority in a class action." *Bee*, 310 F.R.D. at 629 (internal quotation marks omitted). Here, the only possible alternative to litigating the class members' TCPA claims would be individual lawsuits for small amounts of damages.[9] However, individual suits would not only burden the court system, which would have to decide the same legal issues in a large number of small cases, but would also burden the litigants themselves. It is likely that in many, if not most, individual TCPA cases, "litigation costs would dwarf potential recovery." *Hanlon*, 150 F.3d at 1023.

Further, because the class members have little incentive to bring individual actions to recover "the relatively minimal amount of damages" available under the TCPA, they are unlikely to have an interest in individually controlling the

---

[9] A victim of a TCPA violation is entitled to only $500 for each violation. § 227(b)(3)(B).

prosecution of separate actions. *See Knutson v. Schwan's Home Serv., Inc.*, No. 3:12-cv-0964, 2013 WL 4774763, at *10 (S.D. Cal. Sept. 5, 2013) ("Given the relatively minimal amount of damages that an individual may recover in suing for violation of the TCPA, the Court finds a class action would achieve Plaintiffs' objective better than if class members were required to bring individual actions."). Instead, here "[t]he class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23." *Gen. Tel Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982). Moreover, the testimony of Plaintiff's proposed claims administrator, Epiq, further demonstrates that certification here offers a straightforward, manageable way of resolving all class members' claims that numerous other courts have approved. (Azari Decl., ¶¶ 9-19).

If this case does not proceed as a class action, it is also unlikely that Defendants would willingly cease their unlawful telemarketing practices. Current technology provides a strong incentive for advertisers to carelessly or willfully make telemarketing calls *en masse* at relatively little cost. This can only be countered with the possibility that all individuals harmed by such conduct can obtain redress, as the threat of only a few individual actions would not deter such conduct. Proceeding as a class action here is the most efficient, fair, and practical vehicle for determining Defendants' potential liability and the class members' rights under the TCPA.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an order (i) granting Plaintiff's Motion; (ii) certifying the proposed class pursuant to Rule 23(b)(3); (iii) appointing Plaintiff Samuel Katz as class representative; (iv) appointing Myles McGuire, Evan M. Meyers, and Paul T. Geske as class counsel; and (v) awarding such additional relief as the Court deems reasonable and just.

Dated: January 18, 2017

Respectfully submitted,

SAMUEL KATZ, individually and on behalf of a class of similarly situated individuals

By: /s/ Evan M. Meyers
One of Plaintiff's Attorneys

David C. Parisi (SBN 162248)
dcparisi@parisihavens.com
Suzanne Havens Beckman (SBN 188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
212 Marine Street, Ste. 100
Santa Monica, CA 90405
Tel: (818) 990-1299

Evan M. Meyers (*pro hac vice*)
emeyers@mcgpc.com
Paul T. Geske (*pro hac vice* to be filed)
pgeske@mcgpc.com
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I, Evan M. Meyers, an attorney, certify that on January 18, 2016, I filed the foregoing *Plaintiff's Memorandum of Points and Authorities in Support of His Motion for Class Certification* via the Court's CM/ECF electronic filing system. A copy of said document will be electronically transmitted to the following counsel of record:

Michael L. Mallow
Mmallow@Sidley.com
Rachel A. Straus
Rstraus@Sidley.com
SIDLEY AUSTIN LLP
555 W. Fifth Street, Suite 4000
Los Angeles, CA 90013

Eric S. Mattson
emattson@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

Justin Penn
jpenn@hinshawlaw.com
Paul Rodriguez
prodriguez@mail.hinshaw.com
HINSHAW & CULBERTSON LLP
222 N. LaSalle Street, Suite 300
Chicago, Illinois 60601

/s/ Evan M. Meyers