David C. Parisi (SB #162248)
dcparisi@parisihavens.com
Suzanne Havens Beckman (SB #188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
212 Marine Street, Ste. 100
Santa Monica, CA 90405
Tel: (818) 990-1299

*Attorneys for Plaintiff*
[Additional counsel appear on signature page]

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL KATZ, individually and on behalf of a class of similarly situated individuals, | ) Case No. 2:15-cv-04410-CBM-RAO |
| | ) |
| | ) **PLAINTIFF'S MEMORANDUM** |
| | ) **OF POINTS AND AUTHORITIES** |
| *Plaintiff*, | ) **IN OPPOSITION TO** |
| | ) **DEFENDANTS' JOINT MOTION** |
| v. | ) **FOR SUMMARY JUDGMENT** |
| | ) |
| AMERICAN HONDA MOTOR CO., | ) Hearing Date: March 14, 2017 |
| INC., a California corporation, and J.D. | ) Hearing Time: 10:00 AM |
| POWER AND ASSOCIATES, a | ) Location: Courtroom 2 |
| Delaware corporation, | ) |
| | ) Hon. Consuelo B. Marshall |
| *Defendants*. | ) |
| | ) |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF THE ISSUES.......................................................... viii

I.      INTRODUCTION .................................................................... 1

II.     FACTUAL BACKGROUND..................................................... 3

    A.      Defendants' Acura Client Excellence Program ................. 3

    B.      Technology Used To Make The ACE Calls ...................... 4

    C.      The ACE Calls To Plaintiff .............................................. 6

III.    LEGAL STANDARD ............................................................... 7

IV.     ARGUMENT............................................................................ 7

    A.      Plaintiff Has Article III Standing To Sue Defendants For Violating The TCPA........................................................... 7

        i.      Plaintiff has suffered the very harms that Congress sought to prevent when it enacted the TCPA. ........................................ 9

        ii.     A TCPA plaintiff need not incur out-of-pocket costs to have standing under Article III............................................ 10

    B.      Defendants' ACE Program Calls Are Telemarketing, Which Requires Defendants To Have Obtained Plaintiff's Express Written Consent Before Calling His Cellphone. .......................................... 14

        i.      Defendants' ACE Program calls were "telemarketing," which subjects them to the FCC's written consent regulations........... 15

        ii.     Defendants failed to obtain Plaintiff's prior express written consent as required under FCC regulations. ............................ 21

        iii.    Defendants' consent arguments raise genuine issues of fact as to the scope of Plaintiff's purported consent. ........................... 22

    C.      Defendants' Dialing System Has The Capacity To Autodial Cellphone Numbers And Is Therefore An ATDS Under The TCPA.................. 23

        i.      SSI's CATI dialing system is an ATDS, because it has the capacity to predictively dial telephone numbers. .................... 24

        ii.     Defendants' ATDS arguments erroneously focus on the calling system's actual performance, instead of its capacity............... 27

V.    CONCLUSION...............................................................................30

VI.    CERTIFICATE OF SERVICE......................................................32

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

<u>Supreme Court Cases</u>

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992) ...................................................................8

*Mims v. Arrow Financial Servs., LLC*,
 132 S. Ct. 740 (2012)...............................................................9

*Spokeo, Inc. v. Robbins*,
 136 S. Ct. 1540 (2016).................................................. passim

<u>Cases</u>

*Aderhold v. Car2go N.A., LLC*,
 No. 13-cv-489, 2014 WL 794802 (W.D. Wash. Feb. 27, 2014).........................24

*Apple Valley Bldg. & Development Co. v. Bonanza Air Lines, Inc.*,
 423 F.2d 661 (9th Cir. 1970) ...................................................7

*Aranda v. Caribbean Cruise Line, Inc.*,
 No. 12 C 4069, 2016 WL 4439935 (N.D. Ill. Aug. 23, 2016) ...........................13

*Bates v. Dollar Loan Center, LLC*,
 No. 2:13-CV-1731, 2014 WL 3516260 (D. Nev. July 14, 2014) ................. 29, 30

*Belanus v. Clark*,
 796 F.3d 1021 (9th Cir. 2015) ...............................................8

*Bennett v. Boyd Biloxi, LLC*,
 No. 14-0330, 2015 WL 2131231 (S.D. Ala. May 6, 2015).................... 17, 20, 22

*Booth v. Appstack, Inc.*,
 No. C13-1533, 2016 WL 3030256 (W.D. Wash. May 24, 2016).......................11

*Cabiness v. Educ. Fin. Sols., LLC*,
 No. 16-cv-01109, 2016 WL 5791411 (N.D. Cal. Sept. 1, 2016) ................. 10, 14

*Cabiness v. Educ. Fin. Sols., LLC*,
 No. 16-cv-01109, 2017 WL 167678 (N.D. Cal. Jan. 17, 2017)........ 11, 13, 14, 15

*Charkchyan v. EZ Capital, Inc.*,
    No. 2:14-cv-03564-ODW, 2015 WL 3660315 (C.D. Cal. June 11, 2015) ..........22

*Chesbro v. Best Buy Stores, L.P.*,
    705 F.3d 913 (9th Cir. 2012) ....................................................... passim

*Cour v. Life360, Inc.*,
    No. 16-cv-00805, 2016 WL 4039279 (N.D. Cal. July 28, 2016)........... 11, 12, 13

*Espejo v. Santander Consumer USA, Inc.*,
    Nos. 11 C 8987, 12 C 9431, 2016 WL 6037625 (N.D. Ill. Oct. 14, 2016)..........30

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,
    654 F.3d 958 (9th Cir. 2011) ...............................................................28

*Golan v. Veritas Entertainment, LLC*,
    788 F.3d 814 (8th Cir. 2015) ....................................................... 16, 19

*Hernandez v. Collection Bureau of America, Ltd.*,
    No. SACV 13-01626, 2014 WL 4922379 (C.D. Cal. 2014)................................26

*Herrick v. QLess, Inc.*,
    No. 15-cv-14092, 2016 WL 6902544 (E.D. Mich. Oct. 26, 2016) .............. 13, 20

*Hewlett v. Consol. World Travel, Inc.*,
    No. 2:16-713, 2016 WL 4466536 (E.D. Cal. Aug. 23, 2016)................... 9, 11, 13

*Horowitz v. GC Servs. Ltd. P'ship*,
    No. 14cv2512, 2016 WL 7188238 (S.D. Cal. Dec. 12, 2016) ..................... 31, 32

*Juarez v. Citibank, N.A.*,
    No. 16-cv-01984, 2016 WL 4547914 (N.D. Cal. Sept. 1, 2016) ........... 12, 13, 14

*JWD Auto., Inc. v. DJM Advisory Grp.*,
    No. 2:15-cv-793, 2016 WL 6835986 (M.D. Fla. Nov. 21, 2016) ........................13

*Kolinek v. Walgreen Co.*,
    No. 13-cv-4806, 2014 WL 3056813 (N.D. Ill. July 7, 2014)...............................23

*LaVigne v. First Cmty. Bancshares, Inc.*,
    No. 1:15-cv-00934, 2016 WL 6305992 (D.N.M. Oct. 19, 2016) ................. 13, 15

*Lee v. Global Tel\*Link Corp.*,
   No 2:15-cv-02495, 2016 WL 6237896 (C.D. Cal. Feb. 5, 2016) ................. 22, 26

*Lennartson v. Papa Murphy's Holdings, Inc.*,
   No. C15-5307, 2016 WL 51747 (W.D. Wash. Jan. 5, 2016) ..............................23

*Martin v. Leading Edge Recovery Sols., LLC*,
   No. 11 C 5886, 2012 WL 3292838 (N.D. Ill. Aug. 10, 2012) ............... 11, 12, 14

*Mbazomo v. Etourandtravel, Inc.*,
   No. 2:16-cv-02229, 2016 WL 7165693 (E.D. Cal. Dec. 8, 2016) .... 11, 13, 14, 15

*Mey v. Got Warranty, Inc.*,
   No. 5:15-cv-101, 2016 WL 3645195 (N.D. W. Va. June 30, 2016) .....................8

*Meyer v. Bebe Stores, Inc.*,
   No. 14-cv-00267, 2015 WL 431148 (N.D. Cal. Feb. 2, 2015) ...........................12

*Meyer v. Bebe Stores, Inc.*,
   No. 14-cv-00267-YGR, 2015 WL 431148 (N.D. Cal. Feb. 2, 2015) .................21

*Meyer v. Portfolio Recovery Assocs., LLC*,
   707 F.3d 1036 (9th Cir. 2012) ............................................................. 3, 25, 26, 29

*Newmaker v. City of Fortuna*,
   842 F.3d 1108 (9th Cir. 2016) ..............................................................................7

*Pozo v. Stellar*,
   No. 8:15-cv-929, 2016 WL 7851415 (M.D. Fla. Sept. 2, 2016) .................. 30, 31

*Reardon v. Uber Techs., Inc.*,
   115 F. Supp. 3d 1090 (N.D. Cal. 2015) ...............................................................26

*Romero v. Dep't Stores Nat'l Bank*,
   No. 15-cv-193, 2016 WL 4184099 (S.D. Cal. Aug. 5, 2016) ..............................12

*Satterfield* v. *Simon & Schuster, Inc.*
   569 F.3d 946 (9th Cir. 2009) ..................................................................... passim

*Sherman v. Yahoo! Inc.*,
   150 F. Supp. 3d 1213 (S.D. Cal. 2015) ........................................................ 30, 31

*Sherman v. Yahoo! Inc.*,
   997 F. Supp. 2d 1129 (S.D. Cal. 2014) ................................................................30

*Smith v. Aitima Med. Equip., Inc.*,
   No. 16-cv-00339, 2016 WL 4618780 (C.D. Cal. July 29, 2016)................. 12, 13

*Smith v. Microsoft Corp.*,
   No. 11-cv-1958, 2012 WL 2975712 (S.D. Cal. July 20, 2012) ..........................12

*Van Patten v. Vertical Fitness Grp.*,
   -- F.3d --, 2017 WL 460663 (9th Cir. Jan. 30, 2017)................................... passim

Statutes

Fair Credit Reporting Act
   15 U.S.C. § 1681 *et seq*. ....................................................................................8

Telephone Consumer Protection Act
   47 U.S.C. 227 ......................................................................................................1

The Hobbs Act
   28 U.S.C. § 2342 ...............................................................................................26

Regulations

47 C.F.R. § 64.1200 ............................................................................................. passim

Administrative Materials

2015 FCC Order:
*Declaratory Ruling & Order, In re Rules & Regulations Implementing the*
   *Telephone Consumer Protection Act of 1991*,
   30 FCC Rcd. 7961 (2015)............................................... 8, 26, 29, 30, 31

2012 FCC Order:
*Report & Order, In re Rules & Regulations Implementing the Telephone Consumer*
   *Protection Act of 1991*, 27 FCC Rcd. 1830 (2012)...................................... 15, 21

2003 FCC Order:

*Report & Order, In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 (2003) ........................ 18, 20, 24, 25

Other Authorities

Fed. R. Civ. P. 56 ................................................................................................... 7

Pub. L. No. 102-243, § 2, 105 Stat. 2394 (1991) .................................................. 9

S. Rep. No. 102-178 (1991) .................................................................................. 9

## **STATEMENT OF THE ISSUES**

1. Has Plaintiff suffered a concrete injury for purposes of Article III standing, where Defendants repeatedly made automated telemarketing calls to Plaintiff's cellphone, causing an annoying nuisance, wasting Plaintiff's time, and invading his privacy?

2. Automated calls that meet the FCC's definition of "telemarketing" are subject to stringent regulations requiring callers to obtain prior express *written* consent before calling consumers' cellphones. Do Defendants' ACE Program calls constitute "telemarketing," thus subjecting them to the FCC's written consent regulations, where Defendants' calls were intended to increase revenue, promote customer loyalty, and encourage repeat purchases at Acura automobile dealerships?

3. Is Defendants' "Computer Assisted Telephone Interviewing" system an "automatic telephone dialing system" under the TCPA, where the system uses computerized dialing and predictive dialing technology to automatically make calls en masse?

## I.   __INTRODUCTION__

After Plaintiff brought his car to an Acura dealership for routine maintenance, he began repeatedly receiving automated telemarketing calls on his cellphone. He later learned that the calls were coming from Defendants, American Honda Motor Co., Inc. ("Honda") and J.D. Power and Associates ("J.D. Power"), and were part of Defendants' Acura Client Excellence ("ACE") telemarketing program. Under the ACE program, Defendants make millions of automated telemarketing calls every year, targeting Acura owners who recently brought their vehicle to an Acura dealer for service, and encouraging those individuals to remain loyal to the Acura brand so that they return to an Acura dealer for service or for their next car purchase.

Plaintiff asserts claims against Defendants under Section 227(b)(1)(A)(iii) of the federal Telephone Consumer Protection Act (the "TCPA"), and he has moved to certify a class of those who also received ACE telemarketing calls, (Dkt. 78). Defendants have simultaneously moved for summary judgment on Plaintiff's individual TCPA claim, raising three arguments in support of their Joint Motion for Summary Judgment ("Motion" or "MSJ"). However, all three of Defendants' arguments fail as a matter of law under binding Ninth Circuit precedent, and none of them demonstrate that there are no genuine issues of material fact.

As a threshold matter, Defendants challenge Plaintiff's standing under Article III. Relying on the U.S. Supreme Court's recent decision in *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540 (2016), Defendants argue that Plaintiff's harms are "de minimus" and not concrete enough to satisfy the injury-in-fact requirement for Article III standing. *Spokeo* dealt with the issue of whether statutory claims under the Fair Credit Reporting Act are sufficiently "concrete" to establish standing, and following the Supreme Court's decision, there has been some confusion among federal district courts as to how, or whether, the *Spokeo* decision applies to TCPA claims.

The Ninth Circuit recently stepped in and resolved this question. In *Van Patten v. Vertical Fitness Grp.*, -- F.3d --, 2017 WL 460663, at **3-4 (9th Cir. Jan.

30, 2017), the Ninth Circuit held that "[u]nsolicited telemarketing phone calls . . . by their nature, invade the privacy and disturb the solitude of their recipients." To have standing, a "plaintiff alleging a violation under the TCPA 'need not allege any *additional* harm beyond the one Congress has identified.'" *Id.* at *4 (quoting *Spokeo*, 136 S. Ct. at 1549) (emphasis in original). In other words, a TCPA violation is itself a concrete injury. *Id.* Here, Defendants' conduct not only violated the TCPA, it also has caused exactly the kinds of harms that Congress was trying to prevent when it enacted the TCPA. Plaintiff has declared and testified under oath that Defendants' calls invaded his privacy and caused an annoying distraction, a nuisance, and a waste of his time. (*See* Declaration of Samuel Katz ("Katz Decl."), attached hereto, ¶ 12). Defendants' Motion fails to rebut this evidence, and their standing arguments cannot withstand *Van Patten*.

Defendants also argue that Plaintiff has consented to receive automated calls from them. However, Defendants' consent arguments are based on the wrong legal standard for consent. The calls at issue in this case are "telemarketing" calls, which are subject to the FCC's more stringent regulations requiring Defendants to have obtained "prior express *written* consent" from those whom they call. 47 C.F.R. §§ 64.1200(a)(2), (f)(8), (12) (emphasis added). Defendants instead incorrectly rely on the rule for "non-telemarketing and non-advertising calls." (MSJ at 8).

Although consent is an affirmative defense, Defendants' Motion is unsupported by any evidence of Plaintiff's written consent; nor do Defendants assert that any such evidence exists. Instead, Defendants contend that their ACE calls cannot be "telemarketing," because they are just "survey calls." (MSJ at 8-9). Although the ACE calls compile a vast amount of aggregate information about consumers, Defendants were not merely conducting an opinion poll; rather, the ACE calls were intended to increase Honda's revenue by driving repeat business at Acura dealerships. As discussed below, Honda markets Acura as its "luxury" brand, and the ACE calls were designed to be part of a "concierge experience" that offers a

"personal touch" to car buyers. Defendants' hope was that the called parties would become more loyal to the Acura brand and return to Acura dealerships for repeat purchases and maintenance services. Under Ninth Circuit precedent, the ACE calls are thus telemarketing, because the calls were made for the purpose of "encourage[ing] recipients to engage in future purchasing activity" at Honda's dealerships. *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012).

Finally, Defendants also argue that the calling system they used to call Plaintiff does not fall within the TCPA's definition of "automatic telephone dialing system" ("ATDS"). In support of their ATDS arguments, Defendants rely primarily on a declaration from Troy Lauritzen, an employee of third-party Survey Sampling International, LLC ("SSI"), the company that J.D. Power contracted with to carry out the ACE calls. However, Mr. Lauritzen's declaration is not only self-serving, his statements also contradict his own previous sworn testimony during his deposition.

In actuality, the evidence in this case shows that SSI's calling system uses automated calling technology known as a "predictive dialer." Predictive dialers are a type of ATDS, and they have been recognized as such dating back to 2003. *See, e.g., Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012) ("predictive dialers fall squarely within the FCC's definition of 'automatic telephone dialing system.'"). SSI's system has the capacity to predictively dial any phone number without human intervention, regardless of whether that number is a landline or cellphone number, and it had that capacity at the time when Defendants called Plaintiff. SSI's system is therefore an ATDS under controlling authority. Like Defendants' other arguments, Defendants' ATDS argument is wrong as a matter of law and fails to eliminate any genuine issues of material fact. Defendants' Joint Motion for Summary Judgment should therefore be denied in its entirety.

## II.    FACTUAL BACKGROUND

### A.    Defendants' Acura Client Excellence Program.

Defendant Honda is the manufacturer of automobiles sold under the Acura

brand, which it markets as its "luxury" brand. (See Plf's Statement of Additional Undisputed Facts (hereinafter "SAUF"), filed contemporaneously herewith, ¶¶ 1-2). To promote its Acura automobiles, Honda contracted with Defendant J.D. Power, a market research company, to create the ACE program. (SAUF ¶ 3). As part of the ACE program, Defendants place telemarketing calls to consumers who have recently brought an Acura automobile to an Acura dealership for service. (SAUF ¶¶ 4-7).

During ACE calls, customers are first told that "Acura really cares about your experience," and then asked to rate their recent dealership experience on a scale of one to ten. (Ex. C at AHM0000043, 50).[1] The called party is then asked a follow-up question based on the rating. For example, if the called party responds with a number between six and nine, they are told, "To help the dealer provide you with better service, why did you rate this experience a [score]?" (*Id.*).

Defendants intended for their ACE calls to deliver a "concierge experience" in order to promote customer satisfaction and loyalty to the Acura brand. (SAUF ¶¶ 8, 10). Defendants hoped that this would lead to repeat business at Acura dealerships, both from the customer purchasing another Acura and continuing to service her existing Acura, as well as increased sales due to customers recommending Acura to friends and family. (SAUF ¶¶ 12-22). Defendants also used the ACE calls to alert dealerships about particular customers who may have had a negative experience, in order to invite that customer to return to the dealer and decrease the risk of losing that customer's future business. (Ex. A at 67:12-68:2; Ex. B at 30:7-19; Ex. C at AHM0000051). Overall, discovery has shown that the ACE program was specifically designed with the goal of increasing Honda's revenue through encouraging repeat business. (SAUF ¶ 12-22).

### B.   Technology Used To Make ACE Calls.

J.D. Power engaged SSI to place the ACE program's telemarketing calls.

---

[1] Unless otherwise noted, all exhibits (e.g., "Ex. A") are exhibits to the Declaration of Evan M. Meyers, attached hereto.

(SAUF ¶ 47). SSI is a calling vendor and market research company that specializes in internet and telephonic surveying of consumers. (Ex. F at SSI_000084). SSI uses sophisticated calling technology to rapidly and efficiently place millions of outbound calls every year. (Ex. F at SSI_000084).

█████  ████  ██  ███  ████  ████  ██ █  █████  ████  ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████  The system is capable of dialing any type of phone number predictively, progressively, and sequentially and without the need for initiation by a person. (*Id.*).

All ACE telephone interviews are conducted by call center agents sitting at workstations. (*Id.* ¶¶ 48-50). The agents do not have an actual phone at their desks that they use for placing calls; rather, the agents use computers ████████████ ██████████████████████, which simulates the functions of an actual phone. (*Id.*). ████████████████████████████████████████████████. (*Id.*).

████████████████████████. (Ex. E at 99:30-5; Ex. G 145:19-146:9).

██████████. (Ex. F at SSI_000086, 88-90; Ex. I ¶ 23). ████████████████████████████████████████████████████████████████████████████████. (*Id.*).

████████████████████[2] (*Id.*). ████████████████████████████████████████████████

---

[2] A predictive dialer is calling equipment that automatically and rapidly dials phone numbers and utilizes software to predict when a telemarketing agent is available to speak to a called party. Predictive dialers have the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers.

██████████████████████████████████████████████████

████████████████████████████. (SAUF ¶¶ 51-58).

### C.   The ACE Calls To Plaintiff.

In 2015, Plaintiff owned an Acura automobile. (SAUF ¶ 23). In March 2015, Plaintiff brought his Acura to Sunnyside Acura of Nashua New Hampshire, an Acura dealership, to have the car serviced. (*Id*. ¶ 24). In connection with the visit, Plaintiff provided his cellphone number to the dealer so that the dealer could call to let him know when his car was ready to be picked up. (*Id*. ¶ 25).

At no point during Plaintiff's service visit to the Acura dealership did he consent to receive automated telemarketing calls. (*Id*. ¶¶ 26-31). Plaintiff was never made aware of the ACE Program. (*Id.* ¶ 26; Katz Decl. ¶ 4). Nor was he informed that his phone number would later be sent to Honda or J.D. Power so that they could call him to solicit information about his experience at the dealer. (*Id*.). Had the dealer asked Plaintiff if he wanted to receive automated telemarketing calls from Honda or anyone else, Plaintiff would have unequivocally said no. (SAUF ¶ 30).

In the weeks following his service visit to the Acura dealership, Plaintiff began receiving phone calls on his cellphone from the telephone number 410-774-8480, a number that he did not immediately recognize. (SAUF. ¶ 32). Plaintiff received the first of these calls on March 17, 2015. (*Id*. ¶ 33). Over the following days, Plaintiff continued to receive calls from the same number, including on March 19, twice on March 20, March 21, and March 25. (*Id*. ¶ 34; Ex. H at SSI_000132). Each such call invaded Plaintiff's privacy and was a nuisance. (SAUF ¶¶ 35, 41-44). Plaintiff remembers receiving the calls and how they caused an annoying interruption of his activities. (SAUF, ¶ 35). Each time Plaintiff received one of the calls, he was either at work or spending time with his family, and he had to step away from what he was doing to try and figure out who was calling him and how to make the calls stop. (*Id*.). Plaintiff even attempted, to no avail, to call the number back to find out who it was that kept calling him. (*Id*. ¶ 36). After receiving these calls,

Plaintiff learned that the calls were coming from Honda, and that they were the same automated ACE calls that Defendants make to other consumers who have had their cars serviced at an Acura dealership. (*Id.* ¶ 37).

## III.   <u>LEGAL STANDARD</u>

"Summary judgment is an extraordinary remedy, and should only be granted when there is no genuine issue as to any material fact." *Apple Valley Bldg. & Development Co. v. Bonanza Air Lines, Inc.*, 423 F.2d 661, 662 (9th Cir. 1970); Fed. R. Civ. P. 56(a). As such, at the summary judgment stage, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1111 (9th Cir. 2016).

## IV.   <u>ARGUMENT</u>

### A.   **Plaintiff Has Article III Standing To Sue Defendants For Violating The TCPA.**

Defendants' standing argument is wrong as a matter of law and ignores specific evidence of Plaintiff's concrete injuries. Under the Ninth Circuit's recent *Van Patten* decision, TCPA violations are sufficiently concrete to satisfy the injury-in-fact requirement for standing. Further, Defendants' automated telemarketing calls, in addition to violating the TCPA, were a nuisance, an invasion of privacy, and a waste of Plaintiff's time. (SAUF ¶¶ 40-44). Numerous courts across the country have recognized that these harms are sufficient to confer standing.

Courts have defined an "injury in fact" as "an invasion of a legally protected interest which is [] concrete and particularized and actual or imminent, not conjectural or hypothetical." *Belanus v. Clark*, 796 F.3d 1021, 1028 (9th Cir. 2015) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Here, Defendants do not argue that a TCPA violation isn't "an invasion of a legally protected interest." Nor do they assert that Plaintiff's injuries are not actual or particularized. Rather, Defendants rely on *Spokeo* and argue that Plaintiff's harms aren't sufficiently concrete to constitute an injury-in-fact for purposes of standing.

In *Spokeo*, the plaintiff brought suit under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, alleging that the defendant unlawfully disseminated false information about him online. 136 S. Ct. at 1544-46. The Supreme Court declined to decide whether the plaintiff had standing, but it found that the lower court erred by failing to consider whether the plaintiff's injuries were sufficiently concrete. *Id.* at 1550. For that reason, the Court remanded the case back to the Ninth Circuit for proceedings consistent with its opinion. *Id.* However, *Spokeo* did not change or heighten the requirements for standing, as Defendants incorrectly suggest. *Mey v. Got Warranty, Inc.*, No. 5:15-cv-101, 2016 WL 3645195, at *3 (N.D. W. Va. June 30, 2016) ("*Spokeo* [] created no new law; it merely remanded the case to allow the Ninth Circuit to conduct the proper analysis."). Rather, the Court merely reiterated that statutory claims, like other types of claims, "require[] a concrete injury even in the context of a statutory violation." *Spokeo*, 136 S. Ct. at 1549.

Unlike the FCRA claims at issue in *Spokeo*, Plaintiff's TCPA claims are based on unlawful conduct that Congress and numerous courts have long recognized as causing real, concrete harms. *Van Patten*, 2017 WL 460663, at *4. Congress enacted the TCPA "in response to an increasing number of consumer complaints arising from the increased number of telemarketing calls." *Satterfield* v. *Simon & Schuster, Inc.* 569 F.3d 946, 954 (9th Cir. 2009) (citing S. Rep. No. 102-178, at 2 (1991)). Based on an extensive legislative record, Congress found that consumers consider automated telephone calls, regardless of their content or initiator, to be "a nuisance and an invasion of privacy," *id.*, and that "[b]anning such automated or prerecorded calls . . . except when the receiving party consents to receiving the call . . . is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." Pub. L. No. 102-243, § 2(10), 2(12), 105 Stat. 2394 (1991).

The Supreme Court, cognizant of Congress's findings, has similarly observed that "[m]any consumers are outraged over the proliferation of intrusive, nuisance [telemarketing] calls," which "prompted Congress to pass the TCPA." *Mims v.*

*Arrow Financial Servs., LLC*, 132 S. Ct. 740, 744-45 (2012) (alterations in original) (internal quotation marks omitted). Many other courts have also found that the "purpose and history of the TCPA indicate that Congress was trying to prohibit the use of ATDSs to communicate with others by telephone in a manner that would be an invasion of privacy." *Satterfield*, 569 F.3d at 954; *Hewlett v. Consol. World Travel, Inc.*, No. 2:16-713, 2016 WL 4466536, at *2 (E.D. Cal. Aug. 23, 2016).

### i.     *Plaintiff has suffered the very harms that Congress sought to prevent when it enacted the TCPA.*

As a recipient of Defendant's unauthorized calls, Plaintiff has standing to bring suit and vindicate his rights under the TCPA. *Van Patten*, 2017 WL 460663, at *4. Moreover, the record in this case demonstrates that Defendants' conduct has resulted in exactly the kinds of harms that Congress was trying to prevent when it enacted the TCPA. Specifically, Plaintiff has stated under oath that Defendants harassed him by repeatedly calling him. (SAUF ¶¶ 38-44). He remembers that when he received these calls, he heard his phone ring or vibrate and looked at his phone to see who was calling him. (Katz Decl. ¶ 11). When Defendants called him, Plaintiff was either at work or at home spending time with his family or engaged in personal activities. (SAUF ¶ 35). The calls were disruptive and distracting, because after looking at his phone or hearing the phone ring, he had to stop what he was doing to see who was calling him. (*Id.* ¶¶ 35, 37-38; Katz Decl. ¶ 11). Plaintiff also testified that Defendants' calls wasted his time, because he had to spend time trying to figure out who was calling him, and he even called back the caller's telephone number to find out who was calling him in an attempt to make the calls stop. (SAUF ¶ 35-38). Plaintiff has further stated that Defendants' calls also interfered with his unrestricted use of his phone. (SAUF ¶ 40; Katz Decl ¶ 12).[3]

In short, Defendants caused harm to Plaintiff when they called him in violation of the TCPA. *Van Patten*, 2017 WL 460663, at *4; *Cabiness v. Educ. Fin.*

---

[3] As the nonmoving Party, Plaintiff's testimony should be accepted as true and construed in his favor for purposes of this Motion. *Koch v. Hankins*, 928 F.2d 1471, 1473 n.4 (9th Cir. 1991).

*Sols., LLC*, No. 16-cv-01109, 2016 WL 5791411, at *5 (N.D. Cal. Sept. 1, 2016) ("a statutory violation of . . . the TCPA *necessarily* causes harm to the recipient of the automated call" (emphasis added)). Additionally, Defendants' calls were an annoying nuisance that wasted Plaintiff's time and invaded his privacy. Even prior to *Van Patten*, numerous courts had recognized these harms as sufficiently "concrete" to constitute an injury-in-fact for Article III standing. *See, e.g.*, *Mbazomo v. Etourandtravel, Inc.*, No. 2:16-cv-02229, 2016 WL 7165693, at **1-2 (E.D. Cal. Dec. 8, 2016) ("the weight of authority holds that allegations of nuisance and invasions of privacy in TCPA actions are concrete."); *Hewlett*, 2016 WL 4466536, at *2 ("[c]ourts have consistently held that allegations of nuisance and invasion of privacy in TCPA actions are sufficient to state a concrete injury under Article III"); *Cabiness v. Educ. Fin. Sols., LLC*, No. 16-cv-01109, 2017 WL 167678, at *2 (N.D. Cal. Jan. 17, 2017) ("courts have held that a bare statutory violation of the TCPA constitutes a concrete injury for Article III standing purposes"); *Cour v. Life360, Inc.*, No. 16-cv-00805, 2016 WL 4039279, at *2 (N.D. Cal. July 28, 2016) (finding plaintiff "allege[d] a concrete injury sufficient to confer Article III standing" where he received unsolicited text messages from the defendant and "alleged an invasion of privacy"); *Booth v. Appstack, Inc.*, No. C13-1533, 2016 WL 3030256, at *5 (W.D. Wash. May 24, 2016) (finding concrete injury in the form of "waste[d] time answering or otherwise addressing widespread robocalls").

### ii.    *A TCPA plaintiff need not incur out-of-pocket costs to have standing under Article III.*

Defendants' Motion glosses over Plaintiff's testimony about his harms and ignores its legal significance. Instead, Defendants argue that Plaintiff did not suffer concrete injury because he did not incur any additional "out-of-pocket costs," rendering any harms "de minimus." (MSJ at 12). This argument mistakenly conflates monetary damages with standing issues. While out-of-pocket costs may be relevant to the *extent* of damages, they have no bearing on whether a concrete harm actually

occurred. *See Martin v. Leading Edge Recovery Sols., LLC*, No. 11 C 5886, 2012 WL 3292838, at *3 (N.D. Ill. Aug. 10, 2012) (rejecting defendant's argument that "'injury in fact' should be equated with 'actual damages'"). Monetary damages are not required to state a claim under the TCPA, nor are they needed to have standing:

> [T]he TCPA, by its unambiguous terms, does not limit protection to instances in which a plaintiff is charged individually, or even incrementally, for each [call]. . . . [T]he Court finds that by alleging he received a [call] in violation of the TCPA, [plaintiff] has established a particularized injury in satisfaction of Article III premised on the invasion of his privacy, even absent any economic harm.

*Smith v. Microsoft Corp.*, No. 11-cv-1958, 2012 WL 2975712, at **4-5 (S.D. Cal. July 20, 2012); *Meyer v. Bebe Stores, Inc.*, No. 14-cv-00267, 2015 WL 431148, at *2 (N.D. Cal. Feb. 2, 2015) ("courts have found an injury in fact for a purported TCPA violation even where the plaintiff did not receive an additional charge for the [calls] received"); *Martin*, 2012 WL 3292838, at *3 ("Defendants have cited no case holding that monetary loss . . . is a prerequisite for Article III standing").

Defendants fail to cite the numerous cases that have held that Plaintiff's injuries are sufficiently concrete, and instead rely almost entirely on two unpublished district court decisions. (MSJ at 10-12) (citing *Romero v. Dep't Stores Nat'l Bank*, No. 15-cv-193, 2016 WL 4184099 (S.D. Cal. Aug. 5, 2016) and *Smith v. Aitima Med. Equip., Inc.*, No. 16-cv-00339, 2016 WL 4618780 (C.D. Cal. July 29, 2016)). As an initial matter, *Romero* and *Smith* are no longer good law following the Ninth Circuit's *Van Patten* ruling. Further, neither case can be read as establishing a broad de minimus exception to Article III standing in TCPA cases. To the contrary, many courts have recognized that "'any' automated or prerecorded call would be an invasion of the called party's right to privacy, and . . . even a *de minimis* number of automated calls or voicemails would not be condoned." *Martin*, 2012 WL 3292838, at *4 (emphasis in original); *Juarez v. Citibank, N.A.*, No. 16-cv-01984, 2016 WL 4547914, at *3 (N.D. Cal. Sept. 1, 2016) ("[e]ven a single phone call can cause lost

time, annoyance, and frustration."); *Cour*, 2016 WL 4039279, at *2 (finding that the plaintiff had standing even though he did not incur any charges).

Moreover, both *Romero* and *Smith* have been widely criticized, and the courts' reasoning has been repeatedly rejected in other cases. For instance, courts across the country have described *Romero* as an "outlier," stating that the court's reasoning is "draconian" and "hardly convincing." *LaVigne v. First Cmty. Bancshares, Inc.*, No. 1:15-cv-00934, 2016 WL 6305992, at *6 (D.N.M. Oct. 19, 2016); *Cabiness*, 2017 WL 167678, at *2 ("the Court does not find the reasoning in [the *Romero*] decision to be persuasive"); *Mbazomo*, 2016 WL 7165693, at *2 ("the *Romero* court reads requirements into the TCPA that are not plainly in the statute.); *Juarez*, 2016 WL 4547914, at *3 (declining to follow *Romero*).[4] The *Smith* decision has likewise been largely rejected. *See, e.g., JWD Auto., Inc. v. DJM Advisory Grp.*, No. 2:15-cv-793, 2016 WL 6835986, at *3 n.4 (M.D. Fla. Nov. 21, 2016) ("*Smith* is not persuasive here"); *Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2016 WL 4439935, at *6 (N.D. Ill. Aug. 23, 2016) (disagreeing with the *Smith* court's reasoning); *Herrick v. QLess, Inc.*, No. 15-cv-14092, 2016 WL 6902544, at *2 (E.D. Mich. Oct. 26, 2016).[5] As such, neither *Smith* nor *Romero* should be followed here.

Defendants also argue that Plaintiff lacks standing because he did not answer Defendants' unsolicited telemarketing calls. This argument fails for the same reason as Defendants' "out-of-pocket costs" argument. While the amount of time that Plaintiff lost while listening to or answering the calls he received may be relevant to the *extent* of Plaintiff's actual damages, it does not alter the simple fact that a TCPA violation occurred. "[S]uch distinctions go only to the extent of the injury, not

---

[4] *Romero* is also presently on appeal and subject to reversal. *Romero v. Dep't Stores Nat'l Bank*, No. 16-56265 (9th Cir.).

[5] *Smith* is also distinguishable on the grounds that the plaintiff there, unlike in this case, only received one call. The *Smith* court acknowledged that a plaintiff who receives more than one call suffers a concrete injury due to "the injury multiple phone calls can cause." 2016 WL 4618780, at *4. The reasoning in *Smith* thus "supports—rather than undermines" a finding that Plaintiff has alleged a concrete injury here. *Hewlett*, 2016 WL 4466536, at *3.

whether there was a concrete injury at all." *Cour*, 2016 WL 4039279, at *2. A person need not answer unlawful calls to have standing, because "[e]very unconsented call through the use of an ATDS to a consumer's cellular phone results in actual harm . . . *even if she does not answer the phone*." *Cabiness*, 2016 WL 5791411, at *5 (emphasis added). Similarly, "[n]othing in the [TCPA] indicates that Congress sought to protect only those consumers who . . . answered [] unwanted calls[.]" *Martin*, 2012 WL 3292838, at *4.

It is understandable that Plaintiff did not answer unsolicited calls coming from a phone number that he did not recognize, given that Plaintiff—like most other consumers—finds unsolicited telemarketing calls to be an "aggravation, nuisance, and an invasion of privacy." *Juarez*, 2016 WL 4547914, at *3. As explained above, Plaintiff suffered cognizable harms when he received Defendants' calls. Similar to a homeowner who refuses to open the door to a trespasser, Plaintiff's standing does not disappear merely because he avoided worsening that harm by choosing not to speak to Defendants' telemarketing agents.

Ultimately, in order to accept Defendants' standing arguments, the Court would have to overlook *Van Patten* and all of the real harms that Defendants' unlawful telemarketing calls have caused, including the "invasion of privacy" that Congress specifically identified, *Satterfield*, 569 F.3d at 954, as well as the "wasted time" and "annoyance to the consumer" that resulted here. *Cabiness*, 2017 WL 167678, at *2. These injuries may be intangible in some sense, but they are concrete and actionable. *Van Patten*, 2017 WL 460663, at *4; *Cabiness*, 2016 WL 5791411, at *3 ("intangible injuries can nevertheless be concrete"); *Mbazomo*, 2016 WL 7165693, at *2 ("By passing the TCPA, Congress . . . elevat[ed] the receipt of unwelcome telemarketing calls to the status of a cognizable injury."). Even prior to the TCPA, courts recognized these harms as cognizable under the common law. *Van Patten*, 2017 WL 460663, at *4 ("Actions to remedy defendants' invasions of privacy, intrusion upon seclusion, and nuisance have long been heard by American

courts, and the right of privacy is recognized by most states."); *Mey*, 2016 WL 3645195, at *5 (analogizing TCPA violations to common law trespass).

In short, Defendant is asking the Court to "ignore[] the existence of intangible harms that have been recognized in the [TCPA's] legislative history and in the case law[.]" *Cabiness*, 2017 WL 167678, at *2 (quoting *LaVigne*, 2016 WL 6305992, at **3-4). This would contravene controlling Ninth Circuit authority and the TCPA and make it "nearly impossible for a plaintiff to allege a private right of action under the TCPA for automated solicitation calls." *Id.* Defendants' attack on Plaintiff's standing should therefore be rejected.

**B.    Defendants' ACE Program Calls Are Telemarketing, Which Requires Defendants To Have Obtained Plaintiff's Express Written Consent Before Calling His Cellphone.**

Defendants also argue that they are entitled to summary judgment because Plaintiff "provid[ed] his cell phone number in connection with the service of his vehicle." (MSJ at 7-9). This fact is irrelevant here for two reasons. First, Defendants' consent argument is premised on the wrong legal standard. (*Id.*) (citing the rule for "non-telemarketing" calls). While a called party's "prior express consent" is generally an affirmative defense to liability under the TCPA, FCC regulations impose heightened requirements on callers who make "telemarketing" calls. (2012 FCC Order, ¶ 20).[6] The FCC's telemarketing regulations require callers to obtain "express *written* consent" before making automated calls that constitute "telemarketing." 47 C.F.R. § 64.1200(a)(2) (emphasis added).[7] Defendants concede that if the calls in this case are telemarketing, they were required to obtain Plaintiff's

---

[6] The FCC's written consent regulations were a response to an increasing number of consumer complaints and growing frustration over unwanted telemarketing calls. *Report & Order, In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991,* 27 FCC Rcd. 1830 (2012) ("2012 FCC Order").

[7] The FCC found that telemarketing calls pose a greater threat to consumers, and that requiring written consent "will better protect consumer privacy because such consent requires conspicuous action by the consumer – providing permission in writing – to authorize autodialed or prerecorded telemarketing calls[.]" (2012 FCC Order, ¶ 24).

express *written* consent. (MSJ at 8). Nonetheless, Defendants have failed to support their Motion with any record of Plaintiff's written consent.

Second, even if the Court could find that Defendants' calls are not telemarketing, and that Plaintiff could have consented to receive calls when he provided his phone number, Defendants' Motion fails to eliminate the genuine issues of material fact as to the *scope* of Plaintiff's consent. Plaintiff only provided his phone number to an Acura dealership so that the dealer could call him when his car was ready for pickup. (SAUF ¶¶ 25-31). He did not consent to receive any automated solicitation calls, and he did not consent to receive any such calls from Honda or J.D. Power—two different and separate entities. Accordingly, to the extent that Plaintiff could have given permission to be called by providing his phone number, Defendants' calls were outside the scope of that permission. Defendants' consent arguments therefore do not warrant summary judgment.

### i.   *Defendants' ACE Program calls were "telemarketing," which subjects them to the FCC's written consent regulations.*

FCC regulations define "telemarketing" broadly as any telephone call made "for the *purpose* of encouraging the purchase or rental of, or investment in, property, goods, or services." § 64.1200(f)(12) (emphasis added). This definition focuses "not on the caller's characterization of the call, but on the *purpose* of the message." *Chesbro*, 705 F.3d at 918 (emphasis added). In examining whether a call had a telemarketing purpose, courts generally look to the context surrounding the calls. *See, e.g., Golan v. Veritas Entertainment, LLC*, 788 F.3d 814, 820 (8th Cir. 2015) ("'Telemarketing' occurs when the *context* of a call indicates that it was initiated and transmitted . . . for the purpose of promoting property, goods, or services") (emphasis added). In other words, courts evaluate the facts and circumstances surrounding a calling campaign "with a measure of common sense," and do not simply take a defendant at its word. *Chesbro*, 705 F.3d at 918; *Bennett v. Boyd Biloxi, LLC*, No. 14-0330-WS-M, 2015 WL 2131231, at *3 (S.D. Ala. May 6, 2015).

Here, Defendants made all of the calls at issue pursuant to a single, uniform corporate program—the ACE program. Viewed in the context of that program, the purpose of the ACE calls is two-fold: first, the calls are part of what Honda calls its "concierge experience." (SAUF ¶¶ 2, 8-10). Acura is Honda's luxury brand, and the calls offer what Honda's Rule 30(b)(6) deponent, Neil Wada, described as a "personal touch." (SAUF ¶ 11; Ex. A at 75:10-15; 19:16-20:22). Defendants believe that a personal touch is what luxury car owners want, and they intended their calls to be an added service that promotes customer satisfaction and loyalty to the Acura brand—ultimately to encourage customers to return to Acura dealerships in the future for repairs or to purchase another Acura automobile. (SAUF ¶¶ 11-22).

Second, ACE calls are a way for Honda to quickly learn about customers who have had a negative experience at a dealership, so that Honda can invite them back to the dealership and attempt to improve their experience. (AHM0000050-51). When a customer gives a negative response to a survey question, Defendants' system creates an "Opportunity Work Bulletin." (*Id.*). Opportunity Work Bulletins are a type of alert, by which Honda urges Acura dealers to reach out to dissatisfied customers and attempt to resolve whatever is bothering them. (*Id.*; Ex. B at 46:4-48:5). This process, again, is designed to encourage customers to repatronize Acura dealerships by promoting customer satisfaction and loyalty. (*Id.*).[8]

At bottom, the objective of the ACE program is to increase revenue through repeat customers. (SAUF ¶¶ 11-22). Defendants hope that customer satisfaction and loyalty translate into repeat business for Honda—either through customers buying another Acura, returning to an Acura dealer for service, or recommending Acura to friends and family. (*Id.*). When asked about the calls' purpose of generating repeat business, Neil Wada of Honda testified as follows:

> Q: [O]ne of the purposes of the ACE program was to find ways to get customers to come back to dealerships, to go to dealerships for repairs?

---

[8] *See* Plaintiff's Responses to Defendants' Statement of Uncontroverted Facts, filed contemporaneously herewith, at No 3.

A: Yes, that would be one of the reasons.

*    *    *

Q: Would you agree one of the purposes of the ACE program was to increase customer satisfaction amongst Acura customers?

A: Yes, I would say so.

Q: Do you agree there's a clear connection between high client satisfaction with dealership experience and post warrantee service retention as the [ACE manual] suggests?

A: Yes.

Q: [Y]ou would agree there's a greater likelihood that satisfied service clients will return for service at an Acura dealership?

A: I would say so, yes.

Q: Would you agree that there's a greater likelihood that satisfied service clients will buy another Acura when it comes time to purchase their next car?

A: I would say yes also.

(Ex. A at 73:8-14, 76:12-77:9) (objections omitted).

Under controlling Ninth Circuit precedent, the avowed purposes of the ACE calls bring them within the FCC's definition of "telemarketing." In *Chesbro*, 705 F.3d at 915, the plaintiff bought a computer from the electronics store Best Buy, and at the time of his purchase, he provided his contact information and enrolled in a customer rewards program. *Id.* He later received automated calls from Best Buy informing him about changes to the rules of the rewards program. *Id.* at 916-17. The plaintiff subsequently brought suit against Best Buy, alleging that the calls violated the TCPA and were "telemarketing." *Id.* at 917.

Best Buy argued that its calls could not be telemarketing, because they were merely informational courtesy calls to inform the plaintiff about changes to the rewards program, and there was no mention of any specific products or services. *Id.* at 918. The Ninth Circuit rejected Best Buy's argument, holding that "[n]either the [TCPA] nor the [FCC] regulations require an explicit mention of a good, product, or service where the implication is clear from the context." *Id.* The court found that

Best Buy's calls were "motivated in part by the desire to ultimately sell additional goods or services." *Id.* (quoting 2003 FCC Order, ¶ 142).[9] For instance, the calls "thanked [plaintiff] for 'shopping at Best Buy'" and "directed him to a website where he could further engage with the [rewards program]." *Id.* at 918. Based on these facts, the court determined that Best Buy's calls "encouraged recipients to engage in future purchasing activity" and were therefore telemarketing. *Id.*

*Golan*, 788 F.3d 814, is also instructive here. In *Golan*, the plaintiffs received two recorded voicemail messages that stated "This is a public survey call. We may call back later." *Id.* at 817-18. The plaintiffs later learned that the calls were part of a nationwide calling campaign to promote a new movie. *Id.* Had the plaintiffs answered the calls, they would have been asked a few survey questions about whether they were interested in certain topics featured in the film. *Id.*

The *Golan* defendants argued that their calls were not telemarketing because the calls' content showed that they were simply informational survey calls. *Id.* at 820. The court disagreed, holding that the calls' "purpose"—and not their content— "controlled whether they were 'telemarketing.'" *Id.* That purpose, the court said, could be derived from the calls' context. *Id.* ("'Telemarketing' occurs when the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services") (citing 47 C.F.R. § 64.1200). The *Golan* court noted that the defendants were conducting a nationwide campaign to promote a film, and as such, they were "more concerned with getting viewers to see [the movie] than gathering information about them." *Id.* Given this context, the court concluded that the defendants' calls were telemarketing. *Id.*

Here, as in *Golan* and *Chesbro*, the ACE calls are telemarketing, because they were carried out "for the purpose of promoting property, goods, or services" from Acura dealerships. *Id.* Like the calls at issue in *Golan*, the ACE calls purport to be

---

[9] *Report & Order, In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 (2003) (hereinafter "2003 FCC Order").

survey calls, but they are actually promotional in nature. The evidence in this case shows that Defendants created the ACE program's calling campaign to promote customer loyalty to the Acura brand and bring consumers back to Acura dealerships for repeat business. (SAUF ¶¶ 11-22). During the calls, customers are told that "Acura really cares about your experience" and they are asked to provide information "[t]o help the dealer provide you with better service[.]" (Ex. C at AHM0000031). As in *Chesbro*, called parties are directed to a website to further engage with ACE program materials. *Chesbro*, 705 F.3d at 918. With these calls, Defendants were not merely seeking feedback; they intended to "encourage[] recipients to engage in future purchasing activity" at Acura dealerships. *Id.*

Defendants' profit-motives behind the ACE calls further demonstrate that the calls are telemarketing. Scott Yamaguchi, J.D. Power's Rule 30(b)(6) deponent, testified that the ACE calls were intended to increase Honda's "return on investment" by driving customer loyalty and repeat customers at Acura dealerships. (Ex. B at 42:23-44:6). And Mr. Wada testified that a purpose of the ACE program was to increase customer loyalty, which would result in more cars being purchased and more repairs being made at Acura dealerships, which, ultimately would result in more revenue. (Ex. A at 73:-74:9, 76:12-78; Ex. C at AHM0000047; SAUF ¶¶ 14-16). The fact that Defendants initiated these calls "with the hopes to make a profit" thus supports a finding that ACE calls were made to encourage future purchases. *Herrick*, 2016 WL 6902544, at *4. The reason for this is straightforward: "rational businesses" do not aim to promote customer satisfaction "out of altruistic motives, but rather do so with the calculated aim of enticing the recipient to . . . purchase of other items." *Bennett*, 2015 WL 2131231, at *4.

Defendants seemingly acknowledge the commercial nature of the ACE calls, but nonetheless argue that the calls are merely informational survey calls that give customers "opportunity to provide feedback." (MSJ at 2). However, this argument is contrary to the testimony of Defendants' own employees and is belied by the

record. Defendants could have invited feedback through mail, email, posted signs, or even on customers' receipts. But instead they chose to directly call customers, because phone calls are a way to personally engage with customers and foster the "concierge experience," allowing Honda to immediately address a customer's negative experience in the hopes of enhancing brand loyalty and increasing revenue.

Even if the ACE calls were primarily intended to gather customers' feedback, it would not allow Defendants to escape compliance with the FCC's telemarketing regulations. Telemarketing need only be *one* of the purposes of a call in order to subject it to the FCC's telemarketing regulations; it need not be the sole or even the primary purpose. (2003 FCC Order, ¶ 142); *Bennett*, 2015 WL 2131231, at *3. Indeed, the FCC and the Ninth Circuit have held that calls can be telemarketing even where they have a "dual-purpose," that is, where they have "both a customer service or informational component as well as a marketing component." *Chesbro*, 705 F.3d at 917-18 (deferring to the FCC's interpretation of telemarketing as including dual-purpose calls); *Meyer*, 2015 WL 431148, at *3; (2012 FCC Order, ¶ 30).

In its 2003 Order, the FCC offered an example of a dual-purpose call that is remarkably similar to the calls at issue in this case:

> [Dual-purpose] messages may inquire about a customer's satisfaction with a product already purchased, but are motivated in part by the desire to ultimately sell additional goods or services. If the call is intended to offer property, goods, or services for sale either during the call, *or in the future* . . . that call is an advertisement.

(2003 FCC Order, ¶ 142) (emphasis added). Given the FCC's and the Ninth Circuit's position on dual-purpose calls, the only question the Court need ask is "whether, viewed through the lens of common sense, *one purpose* of the defendant[s] in calling the plaintiff was to encourage him to buy goods or services in the future." *Bennett*, 2015 WL 2131231, at *3 (emphasis added). Based on Defendants' own statements about their intent behind the ACE program, as well as the context in which the calls were made, it is apparent that the ACE calls were made at least in part for the purpose

of promoting property, goods, or services from Acura dealerships. This brings Defendants' ACE calls within the ambit of the FCC's telemarketing regulations requiring prior express written consent.[10]

### ii.   Defendants failed to obtain Plaintiff's prior express written consent as required under FCC regulations.

Defendants have failed to support their Motion with any evidence of Plaintiff's prior express written consent. Because "[p]rior express consent is an affirmative defense under the TCPA," the defendant bears the burden of proof on consent issues. *Lee v. Global Tel*Link Corp.*, No 2:15-cv-02495-ODW-PLA, 2016 WL 6237896, at *4 (C.D. Cal. Feb. 5, 2016); *Charkchyan v. EZ Capital, Inc.*, No. 2:14-cv-03564, 2015 WL 3660315, at *3 (C.D. Cal. June 11, 2015). FCC regulations define "prior express written consent" as:

> [A]n agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

47 C.F.R. § 64.1200(f)(8). The signed writing also must include a number of disclosures. *Id.* § 64.1200(f)(8)(i).[11]

---

[10] Although the record already supports a finding that the calls were telemarketing, Plaintiff has yet to receive a significant number of documents from J.D. Power relating to the purpose and intent of the ACE program. After J.D. Power failed to produce documents responsive to Plaintiff's discovery requests, Plaintiff planned to move to compel but agreed not to in exchange for J.D. Power producing emails relating to the purpose and intent of the ACE program. Although the parties agreed for such emails to be searched and produced, no such documents have been produced to date. Plaintiff will seek to supplement this brief with such additional evidence, as appropriate, once it is produced by J.D. Power, either after the filing of a motion to compel, or as is Plaintiff's hope and intent, through amicable agreement of the parties.

[11] For example, the writing must explicitly state that "[b]y executing the agreement," the signer is authorizing the seller to make "telemarketing calls using an automatic telephone dialing system." *Id.* § 64.1200(f)(8)(i)(A). The writing must also state that the signer "is not required to sign the agreement . . . as a condition of purchasing any property, goods, or services." *Id.* § 64.1200(f)(8)(i)(B). Absent such disclosures, the writing is noncompliant. *Lennartson v. Papa Murphy's Holdings, Inc.*, No. C15-5307, 2016 WL 51747, at **1-2 (W.D. Wash. Jan. 5, 2016) (a compliant writing must "meet the definitional requirements of 'prior express written consent' that the FCC's 2012 Order had outlined").

Despite months of discovery, Defendants have failed to produce a written record containing Plaintiff's prior express written consent in compliance with the FCC's telemarketing regulations. Nor do they claim that any such evidence exists. As such, Defendants are not entitled to summary judgment on the basis of consent.

### iii.    Defendants' consent arguments raise genuine issues of fact as to the scope of Plaintiff's purported consent.

In the alternative, even if the Court holds that Defendants' calls were not telemarketing, Defendants still would not have had consent to make ACE calls to Plaintiff. The Ninth Circuit has held that "express consent" is "[c]onsent that is clearly and unmistakably stated." *Satterfield*, 569 F.3d at 955. Where an individual provides their phone number, their consent is limited to the "circumstance in which the consumer gave his or her number." *Van Patten*, 2017 WL 460663, at *1. Here, Plaintiff only provided his number so that the Acura dealer could call him when his car was ready for pickup. (SAUF ¶ 25). He was never informed during his visit to the Acura dealer that Defendants would send him automated solicitation calls. (*Id*. ¶ 26). These facts are undisputed and, as a result, Defendants' calls are outside the scope of any purported consent given to the dealer.

Courts recognize that "[c]onsent for one purpose does not equate to consent for all purposes." *Kolinek v. Walgreen Co.*, No. 13-cv-4806, 2014 WL 3056813, at *4 (N.D. Ill. July 7, 2014); *Van Patten*, 2017 WL 460663, at *6 ("giving a phone number alone" does not "amount[] to consent to receive calls or texts at that number irrespective of purpose."). And, contrary to Defendants' assertions, "the FCC has established no rule that a consumer who gives a phone number to a company has consented to be contacted for any reason." *Van Patten*, 2017 WL 460663, at *7. Rather, FCC orders and rulings show that "the transactional context matters in determining the scope of a consumer's consent to contact." *Id.*

In this case, Plaintiff provided his number to an Acura dealership so that the dealer could inform him when his car was ready for pickup—not so that Defendants

could call him to solicit information and encourage him to return to the dealer for future purchases. (SAUF ¶ 25); (*See* 2012 FCC Order, ¶ 25) ("Consumers who provide a wireless phone number for a limited purpose – for service calls only – do not necessarily expect to receive telemarketing calls that go beyond the limited purpose for which oral consent . . . may have been granted."). Moreover, even if Plaintiff had given consent to the Acura dealer for future calls from that dealer, such consent would not have passed to Defendants. Plaintiff merely provided his phone number to a single Acura dealership in New Hampshire—not to Defendants American Honda Motor Co., Inc. or J.D. Power and Associates, two separate and distinct entities. "[A] person's 'prior express consent' to receive communications from one entity is not 'prior express consent' to receive communications from another entity." *Aderhold v. Car2go N.A., LLC*, No. 13-cv-489, 2014 WL 794802, at *3 (W.D. Wash. Feb. 27, 2014) (citing *Satterfield*, 569 F.3d at 949).

Therefore, in the event the Court holds that Defendants' calls were not telemarketing, there will still be numerous issues regarding the scope of Plaintiff's purported consent. For example, Plaintiff's deposition testimony, reiterated in his declaration, shows that he may have given his phone number with a limiting instruction. (Katz Decl. ¶ 7) ("Whenever I share my cellphone number with a business, I generally instruct the business not to make any telemarketing calls to that number"). Ultimately, however, the finder of fact is in the best position to decide these scope of consent issues. To the extent there is a factual dispute as to the scope of any purported consent, that dispute precludes summary judgment here.

## C.   Defendants' Dialing System Has The Capacity To Autodial Cellphone Numbers And Is Therefore An ATDS Under The TCPA.

Defendants' final argument in support of summary judgment is that the calls at issue were not placed using an ATDS and thus do not run afoul of the TCPA. This argument is contrary to facts in the record, however, as discovery has shown that SSI's CATI dialing system has the capacity to predictively dial telephone numbers,

and is therefore an ATDS. (SAUF ¶¶ 60-61).

The TCPA defines an ATDS as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). In applying the ATDS definition, the Ninth Circuit has put special emphasis on the word "capacity." In *Meyer v. Portfolio Recovery Assocs., LLC*, the Ninth Circuit stated that "the clear language of the TCPA mandates that the focus must be on whether the equipment has the *capacity* to store or produce telephone numbers to be called, using a random or sequential number generator." *Meyer*, 707 F.3d at 1043 (emphasis in original) (quoting *Satterfield*, 569 F.3d at 51). Under the capacity standard articulated by the Ninth Circuit, "a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it." *Satterfield*, 569 F.3d at 51.

### i. SSI's CATI dialing system is an ATDS because it has the capacity to predictively dial telephone numbers.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████ (SAUF ¶¶ 60-61). Generally, a predictive dialer is hardware that, "when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." (2003 FCC Order, ¶ 131). Once the equipment begins dialing, the predictive dialer uses software to detect when a person answers a call and then connect the call to an available call center agent. *Id.*

The FCC has treated predictive dialers as an ATDS since 2003. (2003 FCC Order, ¶ 133) ("the Commission finds that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress."). As recently as 2015, the FCC confirmed that predictive dialers are still an ATDS. (2015 FCC Order, ¶ 11) ("We also reiterate that predictive dialers,

as previously described by the Commission, satisfy the TCPA's definition of 'autodialer'").[12] Numerous courts have deferred to the FCC's findings and definitively held that predictive dialers are an ATDS under the TCPA as a matter of law. *See, e.g., Meyer*, 707 F.3d at 1043; *Loveless v. A1 Solar Power, Inc.*, No. ED CV 14-1779, 2015 WL 4498787, at *3 (C.D. Cal. July 23, 2015); *Hernandez v. Collection Bureau of America, Ltd.*, No. SACV 13-01626, 2014 WL 4922379, at *2 n.1 (C.D. Cal. 2014).

Defendants do not contest the FCC's finding that predictive dialers are an ATDS, nor could they, as district courts do not have jurisdiction to disregard an FCC order without running afoul of the Hobbs Act's jurisdictional bar. 28 U.S.C. § 2342(1) (Congress vested the federal appellate courts with the exclusive jurisdiction "to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" all final FCC orders); *Reardon v. Uber Techs., Inc.*, 115 F. Supp. 3d 1090, 1097 (N.D. Cal. 2015) ("This court is bound by the FCC's interpretations of the TCPA").

Defendants also do not, and cannot, contest that ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ (MSJ at 6). This argument is misguided, however, because it incorrectly isolates a single component ████████ ████████ and attempts to analyze that piece apart from the rest of the system. In the same way that one would not try to determine whether a car is capable of driving by only looking at a single tire, the capacity of the ██████ system cannot be resolved on a piecemeal basis, without looking at the system as a whole. (Ex. F at SSI_000084-85, 88; Ex. G at 13:3-18, 59:11-19; Ex. I ¶¶ 23, 27, 30). ████████████████ ████████████████████████████████████████████████████████.

---

[12] *Declaratory Ruling & Order, In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) (hereinafter "2015 FCC Order").

1  (*Id.*). ████████████████████████████████████, and it must be

2  examined in the context of how it is actually used. (*Id.*).

3     In actuality, ████████████████████████████████

4  ████████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ████████████████████████████████ (Ex. E at 31:14-22).

7  ████████████████████████████████████████████████

8  ████████████████████████████████████████████ (Ex. F

9  at SSI_000086, 88-90; Ex. I ¶ 23). ████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████████████████████████ (SAUF ¶¶

12  49-50). ██████████████████████████████████████████

13  ████████████████████████████████████████████████

14  █████ (*Id.*). ████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████ (*Id.* ¶ 53). ██████████████

17  ████████████████████████████████████ (*Id.* ¶ 55).[13]

18  ████████████████████████████ (Ex. I ¶¶ 23, 27, 30; Ex. G

19  at 13:3-18, 59:11-19). ████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████ (*Id.*; SAUF ¶ 61). In

22  this sense, it is helpful to think of SSI's █████ system like a household faucet, with

23  telephone numbers being the water. Just as a faucet can deliver hot water or cold

24  water, the █████ system can place calls through its ████████████ or its

25  ████████████████. These processes can run simultaneously or independently.

26  And regardless of whether a person turns the hot water handle or the cold water

27  handle, all water (telephone numbers) comes from the same faucet ███████

28

---

[13] *See* Plaintiff's Responses to Defendants' Statement of Uncontroverted Facts, at No. 15.

█████ and goes out through the same drain █████████ into the same sewer system (public telephone network). Even if only cold water is running, the faucet undeniably retains the *capacity* to deliver hot water. Similarly, here, at all times the ████ system had the capacity to predictively dial calls and is therefore an ATDS.

Despite the many components linking SSI's cellphone dialing functionality and predictive dialing functionality, Defendants argue that the two modes are separate systems. (MSJ at 6). In support of this argument, Defendants rely primarily on a declaration from SSI's Chief Information Officer, Mr. Lauritzen. As an officer of SSI, Mr. Lauritzen's testimony is self-interested and of little probative value, and it is thus insufficient to eliminate the genuine issues that exist as to SSI's system. *See Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 967 (9th Cir. 2011).

Further, Mr. Lauritzen's declaration contradicts his earlier sworn testimony in several ways. For example, during his deposition, Mr. Lauritzen admitted that██ ████████████████████████████████████████████ (Ex. E at 99:3-5), ████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████ (*Id.* at 132:6-16). Accordingly, Mr. Lauritzen's testimony *creates* rather than eliminates genuine issues surrounding the system.

### ii. *Defendants' ATDS arguments erroneously focus on the calling system's actual performance, instead of its capacity.*

Despite the ████ system's ability to dial predictively, Defendants nonetheless argue that Plaintiff cannot satisfy the ATDS element of his claims, because SSI has a policy of not making predictively dialed calls to cellphones. (MSJ at 5-6). Defendants assert that the calls to Plaintiff's cellphone were not made using the ████████████████████ and thus were not autodialed. Even if these facts were true, however, they would not preclude a finding that the ████ system is an ATDS, and Defendants would still not be entitled to summary judgment.

As discussed above, under the Ninth Circuit's capacity standard, the relevant

inquiry is whether the CATI system has the *capacity* to autodial numbers—not whether it actually does so in some particular instance. *Meyer*, 707 F.3d at 1043; *Satterfield*, 569 F.3d at 51. This question "revolves around capacity and not actual performance." *Bates v. Dollar Loan Center, LLC*, No. 2:13-CV-1731, 2014 WL 3516260, at *2 (D. Nev. July 14, 2014); (2015 FCC Order, ¶ 15) ("autodialers need only have the 'capacity' to dial random and sequential numbers, rather than the 'present ability' to do so."). Defendants' arguments erroneously focus on actual performance, which "ignores or at least dramatically misconstrues *Satterfield*." *Bates*, 2014 WL 3516260, at *2 (describing Defendants' argument as "encroaching on the bounds set under Federal Rule of Civil Procedure 11(b)(2)"). Regardless of whether the ███████ system was used to call Plaintiff in cellphone dialing mode or predictive dialing mode, it remained an ATDS, because at all times it had the capacity to function as a predictive dialer. (SAUF ¶¶ 59-61).

Moreover, this is not a situation where there is only a remote or theoretical possibility that Defendants could autodial calls. The ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ *See Sherman v. Yahoo! Inc.*, 997 F. Supp. 2d 1129, 1136 (S.D. Cal. 2014) (finding that defendant's system was an ATDS because it could autodial cellphone numbers "by writing new software code instructing the system to do so"); (2015 FCC Order, ¶ 18) ("the Commission has found that a piece of equipment can possess the requisite 'capacity' to satisfy the statutory definition of 'autodialer' even if, for example, it requires the

addition of software to actually perform the functions described in the definition").

Defendants' argument that the calls to Plaintiff were "manually dialed" likewise fails to correctly apply the Ninth Circuit's (and the FCC's) capacity standard. Under this standard, "Defendants' argument that the telephone call[s] at issue here w[ere] manually dialed is irrelevant." *Bates*, 2014 WL 3516260, at \*2. Instead, "[u]nder the FCC's controlling interpretation, the pivotal inquiry is whether the dialing system had the 'capacity' to dial numbers automatically, regardless of whether the calls were made manually[.]" *Espejo v. Santander Consumer USA, Inc.*, Nos. 11 C 8987, 12 C 9431, 2016 WL 6037625, at \*5 (N.D. Ill. Oct. 14, 2016) (emphasis added). [14] Here, the CATI system indisputably has such capacity.

Defendants cite only one case in support of their ATDS argument, an unpublished district court case from Florida. *Pozo v. Stellar*, No. 8:15-cv-929, 2016 WL 7851415, at \*2 (M.D. Fla. Sept. 2, 2016). *Pozo* is neither binding nor persuasive here for several reasons. First, *Pozo* is from outside the Ninth Circuit, so the court there was not bound to follow the capacity standard articulated in *Meyer* and *Satterfield* as this Court is. Second, the *Pozo* court was analyzing a completely different calling system than the one here. Every calling system is different and is composed of different hardware and software, some of which is proprietary and unavailable to other companies. As such, analysis of a calling system requires a fact-specific, case-by-case analysis. *See Sherman*, 150 F. Supp. 3d at 1217. Therefore, the features which made the calling system in *Pozo* not an ATDS do not have a bearing on whether SSI's ▮▮▮▮ system is an ATDS. Third, in *Pozo*, unlike in this case, the defendant's calling vendor provided "multiple types of calling systems" to its clients. *Pozo*, 2016 WL 7851415, at \*2. The *Pozo* court analyzed those systems separately. Conversely, here, there is only one calling system: SSI's ▮▮▮▮ system.

---

[14] Further, the phrase "human intervention" appears nowhere in the TCPA itself, nor the FCC's regulations codified under 47 C.F.R. 64.1200. The FCC has explicitly "*rejected* the argument that the Commission should adopt a 'human intervention' test." *Sherman v. Yahoo! Inc.*, 150 F. Supp. 3d 1213, 1217 (S.D. Cal. 2015) (emphasis in original) (quoting 2015 FCC Order, ¶ 20).

A case that is more analogous to the facts in this case is *Horowitz v. GC Servs. Ltd. P'ship*, No. 14cv2512, 2016 WL 7188238, at *14 (S.D. Cal. Dec. 12, 2016). In *Horowitz*, as here, the defendant's calling system was capable of placing calls in multiple different dialing modes, including a "predictive mode" and a "manual mode." *Id.* The defendant argued, as Defendants do here, that calls made through the manual mode were not ATDS calls, because the different modes "ran 'through separate set[s] of queues,' which constitute separate hardware." *Id.*

The *Horowitz* court nonetheless found that there was a genuine issue of fact as to whether its system was an ATDS. *Id.* Applying the Ninth Circuit's capacity standard, the court reasoned that although "some human interaction [was] used, and perhaps required" to make calls, the defendant "ha[d] not sufficiently foreclosed the possibility that its system also had the capacity to 'store or produce, and dial random or sequential numbers.'" *Id.* (quoting 2015 FCC Order, ¶ 10). The court also emphasized that the defendant's system "may also function as a predictive dialer, which, it is well-settled, would 'satisfy the TCPA's definition of 'autodialer.'" *Id.*

The facts in this case are even more indicative of an ATDS than those in *Horowitz*. Here, there can be no dispute that Defendants' ███ system functions as a ███████. (SAUF ¶¶ 59-61). It had that capacity at the time when Defendants called Plaintiff and the millions of other individuals called as part of the ACE program. (*Id.*). A reasonable jury could therefore find that the CATI system had the capacity to autodial calls to cellphones. Accordingly, Defendants' Motion fails to establish that there are no "genuine issues of material fact regarding whether Defendant used an ATDS," *Horowitz*, 2016 WL 7188238, at *14. Defendants are therefore not entitled to summary judgment.

## V.   **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Defendants' Joint Motion for Summary Judgment be denied in its entirety.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  February 15, 2017

Respectfully submitted,

SAMUEL KATZ, individually and on behalf of a class of similarly situated individuals

By: /s/ Evan M. Meyers
One of Plaintiff's Attorneys

David C. Parisi (SBN 162248)
dcparisi@parisihavens.com
Suzanne Havens Beckman (SBN 188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
212 Marine Street, Ste. 100
Santa Monica, CA 90405
Tel: (818) 990-1299

Evan M. Meyers (*pro hac vice*)
emeyers@mcgpc.com
Paul T. Geske (*pro hac vice*)
pgeske@mcgpc.com
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002

*Attorneys for Plaintiff and the putative class*

## <u>CERTIFICATE OF SERVICE</u>

I, Evan M. Meyers, an attorney, certify that on February 15, 2017, I filed the foregoing *Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Joint Motion for Summary Judgment* via the Court's CM/ECF electronic filing system. A copy of said document will be electronically transmitted to the following counsel of record:

Michael L. Mallow
Mmallow@Sidley.com
Rachel A. Straus
Rstraus@Sidley.com
SIDLEY AUSTIN LLP
555 W. Fifth Street, Suite 4000
Los Angeles, CA 90013

Eric S. Mattson
emattson@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

Justin Penn
jpenn@hinshawlaw.com
Paul Rodriguez
prodriguez@mail.hinshaw.com
HINSHAW & CULBERTSON LLP
222 N. LaSalle Street, Suite 300
Chicago, Illinois 60601

/s/ Evan M. Meyers