David C. Parisi (SB #162248)
dcparisi@parisihavens.com
Suzanne Havens Beckman (SB #188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
212 Marine Street, Ste. 100
Santa Monica, CA 90405
Tel: (818) 990-1299

*Attorneys for Plaintiff*
[Additional counsel appear on signature page]

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL KATZ, individually and on behalf of a class of similarly situated individuals,<br><br>*Plaintiff*,<br><br>v.<br><br>AMERICAN HONDA MOTOR CO., INC., a California corporation, and J.D. POWER AND ASSOCIATES, a Delaware corporation,<br><br>*Defendants*. | Case No. 2:15-cv-04410-CBM-RAO<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: March 14, 2017<br>Hearing Time: 10:00 AM<br>Location: Courtroom 8B<br><br>Hon. Consuelo B. Marshall |

## I. INTRODUCTION

In their Opposition to Plaintiff's Motion for Class Certification, Defendants do not oppose Plaintiff's Motion on the grounds of ascertainability, numerosity, commonality, or adequacy. Instead, Defendants assert that certification is inappropriate because some of the putative class members may have provided their phone number on one of three standard forms, which Defendants have attached to their Opposition. Defendants insist that the Court will have to manually review each putative class member's records to determine whether that individual signed a form consenting to receive calls or agreeing to arbitrate any potential claims, which will raise individual issues that make certification inappropriate.

No individualized review is needed, however, because Honda's customer agreements are standard forms that do not differ among those who signed them. Because Honda's customer agreements are form contracts, the Court can simply look at the forms themselves. *See Rodriguez v. Farmers Ins. Co. of Ariz.*, No. CV 09-06786, 2013 WL 12109896, at *3 (C.D. Cal. Aug. 4, 2013) ("Cases arising out of questions of interpretation of form contracts are especially appropriate for class action resolution."). As a result, any potential consent or arbitration issues can be resolved on a classwide basis through a review of the forms' language.

Because Honda's forms are standardized across its Acura dealerships, the existence of these forms actually supports—rather than undermines—the propriety of certification here. *Id.* Even if it is ultimately determined that individuals who signed a certain form may have agreed to binding arbitration, those members can be separated into a subclass, or simply excluded from the class entirely. For instance, the Court, on its own or by agreement of the Parties, could simply modify the proposed class definition to exclude anyone who leased an Acura (and thus would have signed a Lease Agreement form). Certification should not be denied, as there are multiple, flexible alternatives that stop far short of denying relief to the hundreds of thousands of people who have viable TCPA claims against Defendants.

## II. ARGUMENT

### A. Defendants' Consent Defense Fails As To Each Class Member, Which Makes It A Common Question.

Plaintiff explained in his opening brief that consent issues are common among the class members, because Defendants failed to obtain valid express written consent from any Acura customers before making telemarketing calls to their cellphones. (Class Cert. Mot., Dkt. 81-1, at 25). Defendants now contend that even if their calls were "telemarketing," individualized issues will predominate because some of the class members may have provided their phone numbers on customer forms, and the Court will have to review each form for consent. (Defs' Opp., Dkt. 102, at 7).

This argument fails for two reasons: First, Defendants' Opposition ignores the fact that the telemarketing issue is itself a common question that is "apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Since all putative class members received the same ACE calls as part of the same calling program, the answer to the threshold question of whether Defendants' calls are "telemarketing" will be the same for each class member, regardless of what form they may have signed. (Class Cert. Mot. at 18). And as a result, the same consent standard will apply with respect to the entire class.

Second, and more importantly, none of the forms that Defendants have attached comply with the FCC's written consent regulations. Specifically, none of the forms satisfy the requirements articulated in the FCC's definition of "prior express written consent," 47 C.F.R. § 64.1200(f)(8), and as such, none of them constitute valid written consent to receive the calls at issue here. Consent is therefore a common question notwithstanding the existence of these forms, because Defendants do not have valid consent from any of the class members irrespective of which form may have been used.

The phrase "prior express written consent" is a defined term under the FCC's regulations, requiring:

> [A]n agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

*Id.* The signed writing also must include a number of "clear and conspicuous" disclosures. *Id.* § 64.1200(f)(8)(i). For example, the writing must explicitly state that "[b]y executing the agreement," the signer is authorizing the seller to make "telemarketing calls using an automatic telephone dialing system." *Id.* § 64.1200(f)(8)(i)(A). The writing must also state that the signer "is not required to sign the agreement . . . as a condition of purchasing any property, goods, or services." *Id.* § 64.1200(f)(8)(i)(B). Absent strict compliance with these disclosure requirements, the writing is ineffective. *Lennartson v. Papa Murphy's Holdings, Inc.*, No. C15-5307, 2016 WL 51747, at **1-2 (W.D. Wash. Jan. 5, 2016) (holding that a compliant writing must "meet the definitional requirements of 'prior express written consent' that the FCC's 2012 Order had outlined").

As stated above, Defendants have attached three standard forms to their Opposition brief, but none of the attached forms fully comply with requirements stated in the FCC's written consent definition. For example, The Honda Care agreement, which Defendants also refer to as the Vehicle Service Agreement (Ex. C to Williams Decl., Dkt. 102-2), contains nothing that even purports to be a written consent provision. Nowhere does it mention automated calls or telemarketing. The Honda Financial Services Application (Ex. B to Williams Decl., Dkt. 102-2) mentions debt collection calls, but fails to notify the customer that she will receive *telemarketing* calls. Nor does it contain the required disclosure informing the customer that the agreement is still valid even if the customer chooses not to receive such calls. § 64.1200(f)(8)(i)(B).

The Acura Lease Agreement (Ex. A to Williams Decl.) contains what purports to be a written consent disclosure, but it is buried deep in the Lease Agreement, in

1  paragraph 42, and there is nothing about it that draws the reader's attention to it.
2  Accordingly, it likely fails to satisfy the regulations' "clear and conspicuous"
3  requirement stated in Section 64.1200(f)(8)(i). *See Barrer v. Chase Bank USA, N.A.*,
4  566 F.3d 883, 892 (9th Cir. 2009) (holding that disclosures are not clear and
5  conspicuous where they are "buried too deeply in the fine print"). Further, the Lease
6  Agreement's consent provision is ambiguous, because it ostensibly offers the
7  customer an opportunity to opt out of receiving calls, but there is no mechanism by
8  which the customer may do so. *See FTC v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338,
9  1355 n.14 (D. Nev. 2014) ("an ambiguous disclosure is necessarily not clearly and
10 conspicuously disclosed").

11     Because none of Honda's forms were TCPA compliant, Defendants' consent
12 defense will fail as to each class member no matter which form they signed, if any.
13 And because Defendants' purported sources of written consent can be dealt with on
14 a classwide basis, individualized consent issues will not overwhelm the common
15 issues that already predominate in this case. *See Booth v. Appstack, Inc.*, No. C13-
16 1533JLR, 2015 WL 1466247, at *5 (W.D. Wash. March 30, 2015) ("It 'is not fatal
17 for class definition purposes if a court must inquire into individual records, so long
18 as the inquiry is not so daunting as to make the class definition insufficient'")
19 (quoting *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 566 (W.D. Wash. 2012)).

20     Even if there was some risk that Honda's agreements might implicate
21 individualized issues, denial of certification would be inappropriate given "the range
22 of procedural mechanisms available to courts to deal with potentially individualized
23 affirmative defenses." *Stafford v. Brink's, Inc.*, CV-14-01352-MWF (PLAx), 2015
24 WL 12699458, at *16 (C.D. Cal. Dec. 1, 2015) (citing *William B. Rubenstein,
25 Newberg on Class Actions* § 4:55 (5th ed.)). When confronted with different
26 consumer contracts, "courts typically find it more appropriate to create subclasses
27 rather than deny certification outright." *Baker v. Castle & Cooke Homes Hawaii,
28 Inc.*, No. 11-00616, 2014 WL 1669158, at *13 (D. Haw. April 18, 2014). As one

court explained, "[i]f it becomes clear that an affirmative defense is likely to bar claims against at least some class members, then a court has available adequate procedural mechanisms, such as placing class members with potentially barred claims in a separate subclass." *Bias v. Wells Fargo & Co.*, 312 F.R.D. 528, 542 (N.D. Cal. 2015) (internal quotations and citations omitted).

For instance, if the Court were concerned that Honda's Lease Agreement may raise individualized issues, the Court could modify the proposed class definition to create a subclass of Acura lessees—separate from Acura owners who aren't subject to a Lease Agreement—which would be an administratively feasible way of eliminating any doubts as to the effect of arbitration on commonality. Alternatively, the Court could simply exclude lessees entirely. In any case, outright denial of certification would be inappropriate given that "[c]ourts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members." *Id.*

### B. Potential Arbitration Issues Do Not Preclude Certification.

Defendants contend that some of the putative class members' claims are subject to arbitration, which will raise individualized issues that defeat predominance. In general, however, "the presence of agreements to arbitrate with some of the unnamed Class members does not defeat class certification." *Mora v. Harley Davidson Credit Corp.*, No. 1:08-cv-01453, 2012 WL 1189769, at *13 (E.D. Cal. April 9, 2012). This is because Rule 23 does not require that all defenses be common among the class members. *Cameron v. E. M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976); *Mora*, 2012 WL 1189769, at *13 ("Plaintiff's burden at class certification does not require him to demonstrate [defendant] lacks any individual defense to every Class member.").

For example, in *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 681 (N.D. Cal. 2011), the defendant argued, as Defendants do here, that individualized issues with respect to arbitration agreements would overwhelm any common questions and

1  preclude certification. The court rejected this argument, holding that:

> The fact that some members of a putative class may have signed arbitration agreements or released claims against a defendant does not bar class certification. Other courts presented with this issue have held that 'class certification should not be denied merely because some class members may be subject to the defense that their claims are barred by valid documents releasing the defendant from liability.'

*Id.* at 681 (collecting sources); *Mora*, 2012 WL 1189769, at *13; *Coleman v. General Motors Acceptance Corp.*, 220 F.R.D 64, 90-91 (M.D. Tenn. 2004).

Here, Defendants have not produced evidence showing the number or even proportion of class members whose claims may be subject to arbitration. Absent such evidence, there is no reason to believe that any arbitration issues are significant enough to overwhelm the common questions that do exist in this case. *Baker*, 2014 WL 1669158, at *13 ("While the presence of [arbitration] provisions may mean that some plaintiffs will be unable to prevail on some of the claims[,] . . . it does not follow that individual issues predominate over common ones."). Given that the issues that are central to determining Defendants' liability to the class—the elements of the class members' TCPA claims—are common questions, Defendants have offered no reason to justify departure from the general rule that arbitration agreements do not preclude certification. *Mora*, 2012 WL 1189769, at *14 ("It is not Plaintiff's, nor the putative class members' burden, to demonstrate they *have not* waived the right to participate in these proceedings") (emphasis in original).

Defendants also fail to explain why any arbitration issues that may arise cannot be resolved on a classwide basis. The determination of the scope and validity of arbitration clauses generally raises "common questions of law that lend themselves well for class certification." *Stafford*, 2015 WL 12699458, at *16. In the event that the Parties dispute the enforceability or applicability of Honda's arbitration agreements, such issues will be resolvable in one stroke for all individuals who signed a given form. *Baker*, 2014 WL 1669158, at **12-13. As such, the

Plaintiff's Reply in Supp. of
Mot. for Class Certification                6                Case No. 15-CV-04410-CBM-RAO

arbitration issues are themselves common questions.

Even if it is determined that some members cannot participate in a broader class due to arbitration issues, that still would not be an impediment to certification. *Mora*, 2012 WL 1189769, at *14 ("While it is possible certain Class members may be later excluded based on an agreement to participate in arbitration, this does not defeat the predominance inquiry."). As stated above, the Court could simply create a subclass for all class members who may be subject to arbitration, or alternatively, exclude them from the class entirely. *Id.* The class members subject to arbitration agreements can be readily ascertained, with the scope and enforceability of the arbitration provisions determined uniformly with respect to such members.

Defendants cite *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 1753784, at *3 (N.D. Cal. May 9, 2011), for the proposition that arbitration clauses present "inherently" individualized issues. (Defs' Opp. at 9). However, Defendants' reliance on *Flat Panel* is unavailing, as the *Flat Panel* court did not hold that such issues preclude class certification. In actuality, the court explicitly stated that it was "express[ing] no view on whether [arbitration] issues would or would not have impacted its class certification decision." *Id.* at *3 n.2.

Moreover, regardless of what class is certified, Defendants will still retain the ability to compel arbitration for those class members whose claims are subject to an arbitration clause. During the claims submission process, Defendants can elect to review submitted claim forms, cross-reference them against their records, and choose to arbitrate any claims filed by individuals who, according to Defendants' records, have signed an arbitration agreement.

Alternatively, the Court can appoint a special master to review any submitted claim forms that Defendants choose to challenge. If this proves to be unmanageable, the Court can always revisit its class certification decision at a later time. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments

in the litigation"). However, any such manageability or superiority concerns do not justify denial of class certification. *In re Reformulated Gasoline (RFG) Antitrust & Patent Litig.*, No. CV–05–01671 CAS (VBKx), 2007 WL 8056980, at *11 (C.D. Cal. March 27, 2007) ("Failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule") (citations omitted).

### C. Plaintiff's Decision To Not Answer Defendants' Unsolicited Telemarketing Calls Does Not Subject Him To Unique Defenses.

Finally, Defendants argue that the calls to Plaintiff were "initiated" but not "made," which renders him atypical of the proposed class. (Defs' Opp. at 10). According to Defendants, even though the calls at issue connected to Plaintiff's phone, caused his phone to ring, and appear in the call logs of SSI, Defendants' calling vendor (Dkt. 106-1 at 9), the calls nonetheless weren't "made," because Plaintiff did not also answer the calls. This argument is baseless, however, and Defendants fail to cite any authority which holds that a call is not "made" unless it is also answered.

The TCPA uses the term "make" when referring to calls to cellphones, § 227(b)(1)(A), and the term "initiate" when referring to calls to residential landline phones, § 227(b)(1)(B). Neither of these sections states that violative calls must be physically answered. *See Satterfield*, 569 F.3d at 953-54 (holding that "to call" means "to communicate with or *try to in get communication with* a person by telephone") (emphasis added); *Fillichio v. M.R.S. Assocs., Inc.*, No. 09-61629-CIV, 2010 WL 4261442, at *3 (S.D. Fla. Oct. 19, 2010) ("The text of the TCPA [ ] does not include [ ] a requirement . . . that the recipient of a call must answer the phone or somehow be aware of the call in order for there to be a violation"). Defendants' unsupported argument reads additional requirements into the TCPA that do not exist.

In actuality, numerous courts have held that answering an otherwise unlawful call is not required to state a claim under the TCPA. *See, e.g., King v. Time Warner*

*Cable*, 113 F. Supp. 3d 718, 725 (S.D.N.Y. 2015) ("[defendant] violated the [TCPA] each time it placed a call using its ATDS without consent, regardless of whether the call was answered by a person, a machine, or not at all"); *Moore v. Dish Network, LLC*, 57 F. Supp. 3d 639, 655-56 (N.D.W. Va. 2014) ("the plain language of the TCPA does not require that [a plaintiff] . . . answer a call"); *Martin*, 2012 WL 3292838, at *4 ("[n]othing in the [TCPA] indicates that Congress sought to protect only those consumers who . . . answered [] unwanted calls").

Nor is answering an unlawful call a prerequisite for Article III standing. *Van Patten v. Vertical Fitness Grp.*, -- F.3d --, 2017 WL 460663, at **3-4 (9th Cir. Jan. 30, 2017) ("A plaintiff alleging a violation under the TCPA 'need not allege any *additional* harm beyond the one Congress has identified'") (emphasis in original); *Cabiness v. Educ. Fin. Sols., LLC*, No. 16-cv-01109, 2016 WL 5791411, at *5 (N.D. Cal. Sept. 1, 2016) ("[e]very unconsented call through the use of an ATDS to a consumer's cellular phone results in actual harm . . . *even if she does not answer the phone*") (emphasis added); *Golan v. Veritas Entertainment, LLC*, 788 F.3d 814, 820 (8th Cir. 2015) ("Even when the intended content of a message is not conveyed, the intrusion into the home and the 'seizure' of the phone line is the same.").

Moreover, in this case, whether a called party answered their phone is irrelevant to membership in the proposed class. The class is defined as "[a]ll individuals . . . whose cellphone number(s) *were called* by or on behalf of Defendants[.]" (Class Cert. Mot. at 12) (emphasis added). Accordingly, the proposed class includes individuals who answered Defendants' unsolicited telemarketing calls, as well as individuals who chose not to answer them. Regardless of whether a called party answered the phone, however, all class members possess a TCPA claim that is identical to Plaintiff's. *See Stern v. DoCircle, Inc.*, No. SACV 12-2005, 2014 WL 486262, at *5 (C.D. Cal. Jan. 29, 2014). Indeed, all putative class members received the same calls as part of the same telemarketing program. *Id.* Under these circumstances, "[w]hether [] individuals . . . answered the phone is inconsequential

to the typicality analysis." *Golan v. Veritas Entertainment, LLC*, No. 4:14CV00069, 2017 WL 193560, at *5 (E.D. Mo. Jan. 18, 2017).[1]

Defendants also assert that Plaintiff is atypical of the other class members because he "did not receive a single text message or voicemail from American Honda." (Defs' Opp. at 10). But Defendants themselves admit that none of the ACE calls resulted in messages being left on the called parties' phones. (Lauritzen Decl., Dkt. 84-15, at ¶ 7). Plaintiff is therefore identical to the other class members in this respect, as none of them received text messages or voice mails.

Because answering an otherwise unlawful call is not part of a TCPA plaintiff's prima facie case, nor is it required for Article III standing, Plaintiff is not subject to any unique defenses or legal theories that would make him atypical of the proposed class members. *See Golan*, 2017 WL 193560, at *5.

### III. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an Order granting his Motion for Class Certification.

Dated: February 28, 2017

Respectfully submitted,

SAMUEL KATZ, individually and on behalf of a class of similarly situated individuals

By: /s/ Evan M. Meyers
One of Plaintiff's Attorneys

---

[1] Whether Plaintiff answered the phone is also inconsequential for his individual claim. As Plaintiff states in his opposition to Defendants' Joint Motion for Summary Judgment, he remembers that when he received the calls, he heard his phone ring or vibrate, and looked at his phone to see who was calling him. (Dkt. 106-1 at 9). When Defendants called him, Plaintiff was either at work or at home spending time with his family or engaged in personal activities. (*Id.*). The calls were disruptive and distracting, because after looking at his phone or hearing the phone ring, he had to stop what he was doing to see who was calling him. (*Id.*). Plaintiff also testified that Defendants' calls wasted his time, because he had to spend time trying to figure out who was calling him, and he even called back the caller's telephone number to find out who was calling him in an attempt to make the calls stop. (*Id.*).

David C. Parisi (SBN 162248)
dcparisi@parisihavens.com
Suzanne Havens Beckman (SBN 188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
212 Marine Street, Ste. 100
Santa Monica, CA 90405
Tel: (818) 990-1299

Evan M. Meyers (*pro hac vice*)
emeyers@mcgpc.com
Paul T. Geske (*pro hac vice*)
pgeske@mcgpc.com
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002

*Attorneys for Plaintiff and the putative class*

# CERTIFICATE OF SERVICE

I, Evan M. Meyers, an attorney, certify that on February 28, 2017, I filed the foregoing *Plaintiff's Reply in Support of His Motion for Class Certification* via the Court's CM/ECF electronic filing system. A copy of said document will be electronically transmitted to the following counsel of record:

Michael L. Mallow
Mmallow@Sidley.com
Rachel A. Straus
Rstraus@Sidley.com
SIDLEY AUSTIN LLP
555 W. Fifth Street, Suite 4000
Los Angeles, CA 90013

Eric S. Mattson
emattson@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

Justin Penn
jpenn@hinshawlaw.com
Paul Rodriguez
prodriguez@mail.hinshaw.com
HINSHAW & CULBERTSON LLP
222 N. LaSalle Street, Suite 300
Chicago, Illinois 60601

/s/ Evan M. Meyers